**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CELLULAR SOUTH, INC., et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:11-cv-01690-ESH |
| AT&T INC., et al., | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Defendants AT&T Inc. ("AT&T"), T-Mobile USA, Inc. ("T-Mobile"), and Deutsche Telekom AG ("DT") (jointly, "Defendants") move this Court for an order dismissing Plaintiffs' complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). In support of this motion, Defendants submit a supporting memorandum of points and authorities, along with a proposed order.

Date: September 30, 2011

Respectfully submitted,

/s/ *Mark C. Hansen*
Mark C. Hansen, D.C. Bar # 425930
Michael K. Kellogg, D.C. Bar # 372049
Aaron M. Panner, D.C. Bar # 453608
Kellogg, Huber, Hansen, Todd,
Evans & Figel, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900

Richard L. Rosen, D.C. Bar # 307231
Donna E. Patterson, D.C. Bar # 358701
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
(202) 942-5000

Wm. Randolph Smith, D.C. Bar # 356402
Kathryn D. Kirmayer, D.C. Bar # 424699
Crowell & Moring, LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2500

*Counsel for AT&T Inc.*

George S. Cary, D.C. Bar # 285411
Mark W. Nelson, D.C. Bar # 442461
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500

Richard G. Parker, D.C. Bar # 327544
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

*Counsel for T-Mobile USA, Inc. and Deutsche Telekom AG*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CELLULAR SOUTH, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>AT&T INC., et al.,<br><br>Defendants. | Case No. 1:11-cv-01690-ESH |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT


George S. Cary, D.C. Bar # 285411
Mark W. Nelson, D.C. Bar # 442461
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500

Richard G. Parker, D.C. Bar # 327544
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

*Counsel for T-Mobile USA, Inc. and Deutsche Telekom AG*

Mark C. Hansen, D.C. Bar # 425930
Michael K. Kellogg, D.C. Bar # 372049
Aaron M. Panner, D.C. Bar # 453608
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900

Richard L. Rosen, D.C. Bar # 307231
Donna E. Patterson, D.C. Bar # 358701
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
(202) 942-5000

Wm. Randolph Smith, D.C. Bar # 356402
Kathryn D. Kirmayer, D.C. Bar # 424699
Crowell & Moring, LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2500

*Counsel for AT&T Inc.*


September 30, 2011

## TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

BACKGROUND ..... 2

ARGUMENT ..... 5

I. AS A COMPETITOR, CELLULAR SOUTH LACKS STANDING TO CHALLENGE A HORIZONTAL MERGER OF WIRELESS SERVICE PROVIDERS ..... 5

II. CELLULAR SOUTH HAS NOT PLAUSIBLY ALLEGED THAT THE TRANSACTION WILL HARM CELLULAR SOUTH AS A BUYER OF SERVICES OR EQUIPMENT ..... 6

A. Cellular South's Allegations Related to Wireless Devices and Applications Fail Because Cellular South Fails To Define a Relevant Market or To Provide a Factual Basis for Anticompetitive Effects ..... 6

B. Cellular South's Claims Related to "Roaming" Do Not Establish Standing Because Cellular South Fails To Allege Either a Relevant Market or That the Proposed Transaction Would Affect Cellular South's Supply of Roaming Services ..... 8

CONCLUSION ..... 10

## TABLE OF AUTHORITIES

Page

CASES

*Abbyy USA Software House, Inc. v. Nuance Communications Inc.*, No. C 08-01035 JSW, 2008 WL 4830740 (N.D. Cal. Nov. 6, 2008) ....................8

* *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ....................6

* *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986) ....................6

* *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) ....................7

*Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857 (D.C. Cir. 2008) ....................10

*Pearl Brewing Co. v. Miller Brewing Co.*, Civ. No. SA-93-CA-205, 1993 WL 424236 (W.D. Tex. Mar. 31, 1993), *aff'd*, 52 F.3d 1066 (5th Cir. 1995) ....................6

*Surgical Care Ctr. of Hammond, L.C. v. Hospital Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836 (5th Cir. 2002) ....................7

* *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172 (D.D.C. 2001) ....................8

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003) ....................7

*U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589 (1st Cir. 1993) ....................7

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ....................10

ADMINISTRATIVE DECISIONS

Report and Order and Further Notice of Proposed Rulemaking, *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers*, 22 FCC Rcd 15817 (2007), *modified on recon.*, Order on Reconsideration and Second Further Notice of Proposed Rulemaking, *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, 25 FCC Rcd 4181 (2010) ....................9

Second Report and Order, *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, 26 FCC Rcd 5411 (2011), *appeals pending, Cellco P'ship v. FCC*, Nos. 11-1135 & 11-1136 (D.C. Cir. filed May 13, 2011) ....................10

STATUTES AND REGULATIONS

Clayton Act, 15 U.S.C. § 12 *et seq.* ..........1

§ 7, 15 U.S.C. § 18..........2

§ 16, 15 U.S.C. § 26..........3

47 C.F.R. § 20.12..........9

## INTRODUCTION

Following in Sprint's footsteps, Cellular South has filed its own complaint challenging the merger of AT&T and T-Mobile. As a provider of wireless services to nearly one million customers principally in the southeastern United States, Cellular South would stand to gain from the reduction in competition in wireless services that it alleges will result from the merger. But, like Sprint, Cellular South is concerned not about any reduction in competition, but intensified competition.

There can be no doubt on that score in light of the e-mail that Hu Meena, the President and CEO of Cellular South, sent to Ralph de la Vega, the President and CEO of AT&T Mobility, after the merger was announced. After noting his "serious concerns" about the proposed merger, Mr. Meena stated that AT&T would be "capable of alleviating these issues for Cellular South" if it agreed to allow Cellular South to "build, operate and own an LTE network in the entire state of Mississippi and any other area in southeast that AT[&]T desires" while AT&T would use Cellular South's network services "via attractive [resale] arrangement in the areas in which [Cellular South] builds." *See* Exh. A. In other words, Cellular South suggested that it would not oppose the merger if AT&T would agree not to engage in facilities-based competition in Mississippi. This inappropriate proposal confirms that what Cellular South fears is competition, not lack of competition.[1]

The Court should dismiss Cellular South's suit for lack of standing under the Clayton Act. Because Cellular South's complaint largely overlaps with Sprint's, Defendants will incorporate arguments from their motion to dismiss Sprint's complaint while addressing any

[1] Mr. Meena later stated that his original e-mail had been "misinterpreted" and that he "never made any offer to take or not to take any position with the FCC with respect to the proposed merger." *See* Exh. B.

points that are arguably new in Cellular South's complaint. As with Sprint, Cellular South cannot complain about any alleged reduction in wireless service competition, because Cellular South is not a consumer but instead a competitor in the sale of wireless services. *See* Point I, *infra*; Defendants' Sprint Mot., Part I. As with Sprint, Cellular South's claim that the transaction will impair Cellular South's access to new wireless devices fails to establish its standing because the complaint lacks the factual allegations necessary to make out a plausible claim that the transaction will lead to foreclosure of the market for devices. *See* Point II.A, *infra*; Defendants' Sprint Mot., Part II.C. And, as with Sprint, Cellular South's claim that the transaction will prevent it from purchasing "roaming" ignores the fact that, except for a tiny fraction of its customers, Cellular South does not – and cannot – allege that it purchases roaming service from either AT&T or T-Mobile. *See* Defendants' Sprint Mot., Part II.B. Even with respect to the tiny fraction of Cellular South customers that may still use GSM technology, Cellular South does not plausibly allege that it will suffer any injury related to the purchase of roaming in light of existing contracts and the FCC's requirement that wireless service providers offer such services at just and reasonable rates. And Cellular South's allegations concerning the merger's future impact on "4G-LTE" roaming services are too speculative to state a claim of antitrust injury, because Cellular South does not allege that either it or T-Mobile has an LTE network. *See* Point II.B, *infra*.

## BACKGROUND

On March 20, 2011, AT&T entered into a stock purchase agreement to acquire T-Mobile from its parent company, Deutsche Telekom, and to merge the two companies' mobile wireless telecommunications services businesses. On August 31, 2011, the United States filed an action under § 7 of the Clayton Act, 15 U.S.C. § 18, seeking permanently to enjoin the acquisition. *See*

Compl. ¶ 15. Sprint Nextel Corporation, a competing wireless services carrier, filed its own complaint one week later seeking the same injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. *See id.* ¶ 16. Nearly two weeks later, and two days before the first scheduled hearing in the United States' action, Cellular South filed its own complaint seeking identical relief under § 16 of the Act. *See id.* ¶ 19.

Many of Cellular South's allegations focus on the supposed effects the transaction will have on *consumers* of wireless telecommunications services. *See, e.g.*, Compl. ¶¶ 7, 13, 89, 103. But Cellular South is a competitor in this market, not a consumer. Cellular South characterizes the market for such services as "highly concentrated" and claims that it will become "significantly more concentrated" as a result of AT&T and T-Mobile's merger. *Id.* ¶ 77. Therefore, according to Cellular South, the merger "raise[s] a presumption that it would be likely to enhance market power." *Id.* ¶ 80. Cellular South characterizes T-Mobile as "a low-price competitor with a business plan to be an emerging challenger" in the wireless market. *Id.* ¶ 73. It alleges that T-Mobile's elimination through the merger will "translate into reduced competition, higher prices, and decreased innovation for consumers" of wireless services and will "put more profits in the pockets of AT&T and Verizon." *Id.* ¶ 76. Cellular South additionally alleges that "rural areas" previously have been "of less interest" and "have not been as attractive" to AT&T and Verizon, allowing Cellular South to establish a base of local subscribers with attractive pricing and services. *Id.* ¶¶ 22-23.

Cellular South also advances claims about the merger's alleged effects on input markets in which Cellular South is a customer. *First*, Cellular South alleges that the merger will "increase [AT&T's] ability improperly to limit access by its smaller wireless rivals to the latest handsets and other devices." *Id.* ¶ 63. Cellular South claims that merging AT&T and T-Mobile

will "eliminat[e] . . . an independent source of demand" for devices that in turn "will accelerate the development by AT&T and Verizon of their own separate 'ecosystems' of compatible infrastructure, equipment, and devices that cannot be utilized by other competitors," thus increasing AT&T's and Verizon's "incentive and power to exclude competitors from those ecosystems." *Id.* ¶ 50. Cellular South asserts that AT&T will "demand" or "coerc[e] a post-merger increase in the length and scope" of its exclusive device contracts, with an intent "to foreclose its rivals from a critical input necessary to compete effectively." *Id.* ¶ 59. Cellular South further alleges that the merger will "[i]mpair[ ]" its ability to offer new 4G-LTE service, as it already has experienced "difficulty" acquiring compatible devices due to existing market concentration. *Id.* ¶¶ 55-56.

*Second,* Cellular South alleges that prices for "roaming" – a service that one wireless carrier provides to the customers of another in areas where the first provider lacks network coverage – will rise, or will be more difficult to obtain, once AT&T and T-Mobile merge. *Id.* ¶ 27. Cellular South recognizes that roaming agreements are only possible between carriers that use compatible network technology. *See id.* ¶¶ 27, 67. For their second-generation (or "2G") and third-generation (or "3G") networks, Cellular South alleges that both AT&T and T-Mobile use a technology known as Global System for Mobile Communications ("GSM"), *see id.* ¶¶ 38, 66, while Verizon uses Code Division Multiple Access ("CDMA") technology, *see id.* ¶ 38.[2] For the overwhelming majority of its customers, Cellular South provides service using CDMA technology. *See id.* ¶ 20. Less than 3 percent of Cellular South's customers – up to 25,000 subscribers from the recently acquired Corr Wireless, out of 887,000 total customers – receive services using GSM technology. *See id.* ¶¶ 21, 67. In other words, Cellular South serves more

[2] Sprint also operates using CDMA technology. *See* Sprint Compl. ¶¶ 44-45.

than 97 percent of its customers using a network technology that is not compatible with AT&T's or T-Mobile's at all. For the remaining small number of GSM customers, Cellular South alleges that T-Mobile has provided 2G roaming and that AT&T has offered 3G roaming capability. *See id.* ¶ 67. Cellular South alleges that, after the merger, "AT&T will leverage its increased market power over nationwide roaming . . . to further eliminate or marginalize Cellular South . . . with the purpose and effect of eliminating or reducing competition." *Id.* ¶ 72. Cellular South also alleges that it plans to develop a fourth-generation network using Long Term Evolution ("4G-LTE") technology, *see id.* ¶ 46, but it "will need access to roaming on a nationwide 4G-LTE network in order to survive," *id.* ¶ 69. Cellular South contends that the proposed merger would "eliminate one of Cellular South's potential national roaming partners for 4G-LTE service" – even though it concedes that T-Mobile has no LTE network today – and would allow AT&T to "abuse its power . . . to deny or delay or improperly condition 4G-LTE nationwide data roaming." *Id.* ¶¶ 70-71.

## ARGUMENT

### I. AS A COMPETITOR, CELLULAR SOUTH LACKS STANDING TO CHALLENGE A HORIZONTAL MERGER OF WIRELESS SERVICE PROVIDERS

Although Cellular South complains about the supposed effects of the proposed transaction on competition in the provision of wireless services, Cellular South, as a competitor, is categorically without standing to complain of those effects. *See* Defendants' Sprint Mot., Part I. Cellular South's complaint provides a clear window into its true concern: that a more efficient, post-merger AT&T will have the capacity and the resources to compete on price and service in low-income or rural markets that heretofore "have not been as attractive" or "have been of less interest" to the carrier. Compl. ¶¶ 22-23. Cellular South would prefer an

uncontested market for its local wireless subscribers, without AT&T intruding with more attractive service offerings. *See* Exh. A. But a competitor facing the threat of greater competition has no standing to pursue relief under the antitrust laws. *See, e.g.*, *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116-17 (1986) ("[C]ompetition for increased market share[ ] is not activity forbidden by the antitrust laws."); *Pearl Brewing Co. v. Miller Brewing Co.*, Civ. No. SA-93-CA-205, 1993 WL 424236, at *3 (W.D. Tex. Mar. 31, 1993) ("What plaintiffs apparently fear is the loss of profits due to price competition [resulting from the transaction]; this does not [rise] to a threat of antitrust injury.") (citing *Cargill*, 479 U.S. at 117), *aff'd*, 52 F.3d 1066 (5th Cir. 1995) (Table); *cf. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (noting that a plaintiff does not suffer antitrust injury by being "depriv[ed] . . . of the benefits of increased concentration"). Accordingly, the arguments set forth in Defendants' Motion to Dismiss Sprint's complaint apply here. *See* Defendants' Sprint Mot., Part I.

## II. CELLULAR SOUTH HAS NOT PLAUSIBLY ALLEGED THAT THE TRANSACTION WILL HARM CELLULAR SOUTH AS A BUYER OF SERVICES OR EQUIPMENT

### A. Cellular South's Allegations Related to Wireless Devices and Applications Fail Because Cellular South Fails To Define a Relevant Market or To Provide a Factual Basis for Anticompetitive Effects

Cellular South's claim that the merger will impair competition in wireless services by denying competitors access to handset devices and applications tracks Sprint's complaint and fails for the same reasons. Exclusive distribution arrangements, like other vertical restraints, generally *enhance* inter-brand competition. Exclusive dealing arrangements involving handsets and applications cannot harm competition in the alleged market for wireless services so long as those arrangements do not foreclose competitors from alternative handsets and applications. *See*

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir. 2003) ("For an exclusive dealership arrangement to cause a harm to competition . . . , it must prevent competitors from getting their products to consumers *at all*.") (emphasis added); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 208-09 (4th Cir. 2002); *Surgical Care Ctr. of Hammond, L.C. v. Hospital Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 842 (5th Cir. 2002); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 595-97 (1st Cir. 1993) (Boudin, J.); *see also* Defendants' Sprint Mot., Part I.C.

Cellular South fails to allege that exclusive dealing arrangements could conceivably have that effect because its complaint lacks any allegations about the nature of the marketplace for wireless devices and applications or about the degree of foreclosure that exclusive dealing arrangements supposedly might achieve. Cellular South alleges that "48% of [its] current customers have smartphones or similar devices," Compl. ¶ 41, but that figure only undercuts the contention that it has had difficulty obtaining access to smartphones due to its smaller size. In any event, Cellular South (like Sprint) provides no additional market facts to support its claim, such as the number of device manufacturers competing, the number of devices available to consumers, or the nature and speed of innovation in wireless devices. *See* Defendants' Sprint Mot., Part II.C. Cellular South also speculates that the merger will affect its ability to obtain devices compatible with its planned 4G-LTE network. *See* Compl. ¶¶ 55-58. But such speculation is insufficient in light of the complaint's failure to address the facts about the marketplace for wireless devices to show that Cellular South will be foreclosed from offering 4G-LTE services to consumers as a result of the merger. *See Dickson*, 309 F.3d at 209 (affirming dismissal of exclusive dealing claim where complaint failed to include "an allegation regarding [defendants'] power or share in the [relevant] market" and thus provided "no basis . . .

for concluding that [the] agreements at issue . . . [were] likely to foreclose a significant share of the relevant software markets"); *Abbyy USA Software House, Inc. v. Nuance Communications Inc.*, No. C 08-01035 JSW, 2008 WL 4830740, at *2 (N.D. Cal. Nov. 6, 2008) ("Even accepting as true the allegation that [plaintiff] is foreclosed from 'certain retail outlets,' this fails to constitute an allegation of harm to the market generally or specific harm suffered by [plaintiff]."); *see also* Defendants' Sprint Mot., Part II.C.

### B. Cellular South's Claims Related to "Roaming" Do Not Establish Standing Because Cellular South Fails To Allege Either a Relevant Market or That the Proposed Transaction Would Affect Cellular South's Supply of Roaming Services

At the threshold, Cellular South's allegations relating to roaming do not state a claim because the complaint fails to plead sufficient facts regarding any supposed market for roaming services, including anything about the terms or conditions under which Cellular South currently purchases, or sells, roaming services. Cellular South's roaming allegations thus fail to show that the merger threatens any substantial reduction in competition that could affect Cellular South. Indeed, because Cellular South does not even attempt to define the scope of any alleged market for "roaming services," it fails to plead the required predicate for an assertion of competitive harm. *See, e.g.*, *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 181-82 (D.D.C. 2001); *see also* Defendants' Sprint Mot. at 13-14 (citing cases).

In addition, Cellular South's claim that the transaction will reduce competition for so-called "roaming services" fails to establish standing because no more than a small fraction of Cellular South's customer base relies on roaming technology compatible with AT&T's and T-Mobile's networks. Cellular South overwhelmingly utilizes CDMA technology, and therefore it can purchase roaming only from carriers that employ those technologies – which AT&T and

T-Mobile do not. *See* Compl. ¶¶ 20, 38, 43. For more than 97 percent of its customers, Cellular South neither purchases roaming services from, nor sells roaming services to, AT&T or T-Mobile; nor does Cellular South allege that any of its current suppliers (or purchasers) of CDMA roaming services supply roaming to (or purchase roaming from) the merging parties. Cellular South will continue to be able to purchase roaming from CDMA carriers after the merger, and its available supply of roaming services will therefore be virtually unaffected by the transaction. Cellular South's assertion that AT&T and T-Mobile's merger will nevertheless somehow result in Cellular South paying higher roaming rates for its CDMA technology *to Verizon* has no greater factual support than the parallel allegation in Sprint's complaint. *See* Defendants' Sprint Mot., Part II.B.

For the less than 3 percent of its customers that allegedly use GSM service, Cellular South alleges that it has a 2G roaming agreement with T-Mobile (and a 3G roaming agreement with AT&T).[3] Compl. ¶ 67. Cellular South alleges nothing about the terms of its agreement with T-Mobile or the extent to which Cellular South is a supplier (and not just a customer) of roaming services; nor does Cellular South offer any reason to believe it will be cut off from roaming after the transaction is completed. Moreover, Cellular South ignores the impact of the FCC's regulations, which require all mobile wireless carriers to provide roaming for common carrier services to other carriers on a just, reasonable, and non-discriminatory basis.[4] The FCC

[3] Cellular South claims dissatisfaction with the terms of its *current* 3G roaming agreement with AT&T, but Cellular South fails to allege how the acquisition of T-Mobile will have any impact on Cellular South's 3G roaming options.

[4] *See* 47 C.F.R. § 20.12; Report and Order and Further Notice of Proposed Rulemaking, *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers*, 22 FCC Rcd 15817 (2007), *modified on recon.*, Order on Reconsideration and Second Further Notice of Proposed Rulemaking, *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, 25 FCC Rcd 4181 (2010).

also currently requires all wireless broadband providers to negotiate data roaming agreements in good faith and to offer rates and terms that are commercially reasonable.[5] Given FCC regulation of roaming, Cellular South provides no plausible factual basis for any threatened injury. *Cf. Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004).

Cellular South also alleges that the merger may affect its ability to obtain roaming on 4G-LTE networks in the future, but – even leaving FCC regulation to one side – Cellular South's highly speculative assertions offer no basis for antitrust standing. Cellular South asserts that any carrier besides Verizon or AT&T must "make arrangements for . . . *prospective* 4G-LTE roaming," Compl. ¶ 65 (emphasis added), but it concedes that it has not yet implemented 4G-LTE service and that T-Mobile likewise has no LTE network, *id.* ¶¶ 66, 68, 70. Market conditions years after the transaction will depend on any number of factors, and Cellular South cannot establish standing by claiming that the transaction will endanger its access to technology that neither Cellular South nor T-Mobile employs. Where a plaintiff sues under the antitrust laws based on the alleged exclusion of a *potential* competitor from the market, it must establish – as a predicate for antitrust standing – that the competitor "was willing and able to supply it but for" the alleged violation. *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008). Cellular South does not and cannot make any such allegations.

## CONCLUSION

The Court should dismiss Cellular South's complaint for lack of antitrust standing.

---

[5] *See* Second Report and Order, *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, 26 FCC Rcd 5411, 5423, ¶ 23 (2011), *appeals pending*, *Cellco P'ship v. FCC*, Nos. 11-1135 & 11-1136 (D.C. Cir. filed May 13, 2011).

Dated: September 30, 2011

Respectfully submitted,

/s/ *Mark C. Hansen*
Mark C. Hansen, D.C. Bar # 425930
Michael K. Kellogg, D.C. Bar # 372049
Aaron M. Panner, D.C. Bar # 453608
Kellogg, Huber, Hansen, Todd,
Evans & Figel, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900

Richard L. Rosen, D.C. Bar # 307231
Donna E. Patterson, D.C. Bar # 358701
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
(202) 942-5000

Wm. Randolph Smith, D.C. Bar # 356402
Kathryn D. Kirmayer, D.C. Bar # 424699
Crowell & Moring, LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2500

*Counsel for AT&T Inc.*

George S. Cary, D.C. Bar # 285411
Mark W. Nelson, D.C. Bar # 442461
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500

Richard G. Parker, D.C. Bar # 327544
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

*Counsel for T-Mobile USA, Inc. and Deutsche Telekom AG*

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 30, 2011, I caused the foregoing Memorandum in Support of Defendants' Motion To Dismiss Plaintiffs' Complaint to be filed using the Court's CM/ECF system, which will send e-mail notification of such filings to counsel of record. This document is available for viewing and downloading on the CM/ECF system.

*/s/ Mark C. Hansen*
Mark C. Hansen