**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

| | |
|---|---|
| **SPRINT NEXTEL CORP.** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Civil Action No. 11-1600 (ESH)** |
| | ) |
| **AT&T INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| ———————————————————— | ) |
| | ) |
| **CELLULAR SOUTH, INC., et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) **Civil Action No. 11-1690 (ESH)** |
| | ) |
| **AT&T INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| ———————————————————— | ) |

**<u>MEMORANDUM OPINION</u>**


**INTRODUCTION**

These are antitrust cases between competing mobile wireless carriers.  Before the Court
are motions to dismiss lawsuits which Sprint and Cellular South brought to enjoin AT&T's
proposed acquisition of T-Mobile.  AT&T and T-Mobile move for dismissal pursuant to Federal
Rule of Civil Procedure 12(b)(6), arguing that Sprint's and Cellular South's complaints fail to
adequately allege that the merger would cause them "antitrust injury," and therefore that they

1

lack the "antitrust standing" required to seek injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26.[1]

Plaintiff Sprint Nextel Corporation ("Sprint") is the third largest national provider of mobile wireless services, with 50 million wireless customers.  (Sprint Compl. ¶ 96.)  In 2010, Sprint "accounted for 15 percent of all mobile wireless services revenues."  (*Id.*)  Plaintiffs Cellular South, Inc., and its wholly owned subsidiary Corr Wireless Communications, L.L.C. (collectively, "Cellular South" unless otherwise stated), are regional carriers operating a wireless network that "serves more than 887,000 customers located in Mississippi, Tennessee, Alabama Florida, and other surrounding states."  (Cellular South Compl. ¶¶ 1, 21.)

Defendant AT&T Mobility, L.L.C. ("AT&T"), the wholly owned subsidiary of defendant AT&T, Inc., is the second largest national carrier,[2] with 95 million customers.  (Sprint Compl. ¶¶ 15, 94.)  In 2010, AT&T "accounted for 32 percent of all mobile wireless services revenues." (*Id.* ¶ 94.)  Defendant T-Mobile USA, Inc. ("T-Mobile"), the wholly owned subsidiary of defendant Deutsche Telekom AG, is the fourth largest national carrier, with 34 million customers.  (Sprint Compl. ¶¶ 16, 97.)  In 2010, T-Mobile "accounted for 12 percent of all mobile wireless services revenues."  (*Id.* ¶ 97.)

---

[1] Although properly treated as a threshold matter, antitrust standing is nonetheless an affirmative element of any antitrust suit brought by a private plaintiff and is assessed on a motion to dismiss according to the Rule 12(b)(6) standard, not that of Rule 12(b)(1) applicable to challenges to constitutional standing.  *See Palmyra Park Hosp. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1298 (11th Cir. 2010) (applying Rule 12(b)(6)); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 447 (6th Cir. 2007) (en banc) (same); *see also Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1321 (9th Cir. 1996) (Trott, J., concurring) ("The plaintiff's ability to fulfill the requirements of antitrust standing is an essential threshold element of an antitrust case whereas constitutional standing is essential to the jurisdiction of the court.").

[2] Verizon "is the largest wireless carrier in the United States," with 104 million customers and 35 percent of mobile wireless services revenues.  (Sprint Compl. ¶ 95.)

On March 20, 2011, AT&T entered into a stock purchase agreement to acquire T-Mobile and to merge the two companies' mobile wireless services businesses.  Five months later, the United States brought suit to enjoin the acquisition, alleging that its effect would "be substantially to lessen competition, or to tend to create a monopoly" in violation of § 7 of the Clayton Act.  15 U.S.C. § 18.[3]  Sprint and Cellular South filed the present suits in the subsequent weeks,[4] and defendants moved to dismiss both.[5]

The Court heard argument on defendants' motions on October 24, 2011.  Having considered the parties' positions and the relevant legal principles, the Court will grant the motions except as to plaintiffs' claims regarding mobile wireless devices, and Cellular South's roaming claim insofar as it relates to Corr Wireless.

## ANALYSIS

## I.     GOVERNING LEGAL PRINCIPLES

Section 16 of the Clayton Act authorizes private parties to seek injunctive relief to protect "against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.  While the statute's text is broad, providing for suits by "[a]ny person, firm, corporation, or association,"

---

[3] *See* Complaint, *United States v. AT&T*, No. 11-cv-1560 (D.D.C. Aug. 31, 2011) [Dkt. No. 1].

[4] *See* Complaint, *Sprint v. AT&T*, No. 11-cv-1600 (D.D.C. Sept. 6, 2011) [Dkt. No. 1] ("Sprint Compl."); Complaint, *Cellular South v. AT&T*, No. 11-cv-1690 (D.D.C. Sept. 19, 2011) [Dkt. No. 1] ("Cellular South Compl.").

[5] *See* Motion to Dismiss, *Sprint v. AT&T*, No. 11-cv-1600 (D.D.C. Sept. 30, 2011) [Dkt. No. 16] ("Motion to Dismiss Sprint"); Motion to Dismiss, *Cellular South v. AT&T*, No. 11-cv-1690 (D.D.C. Sept. 30, 2011) [Dkt. No. 17] ("Motion to Dismiss Cellular South").  Sprint and Cellular South filed a joint opposition to AT&T's motions.  *See* Joint Opposition, *Sprint v. AT&T & Cellular South v. AT&T*, No. 11-cv-1600 & No. 11-cv-1690 (D.D.C. Oct. 7, 2011) [Dkt. No. 26 & Dkt. No. 26] ("Joint Opp'n").  Defendants filed a combined reply brief.  *See* Reply Memorandum, *Sprint v. AT&T & Cellular South v. AT&T*, No. 11-cv-1600 & No. 11-cv-1690 (D.D.C. Oct. 13, 2011) [Dkt. No. 27 & Dkt. No. 30] ("Reply").

*id.*, courts have limited its reach to those plaintiffs that allege a threat of "antitrust injury." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986).

Antitrust injury is injury "of the type the antitrust laws were designed to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Accordingly, a private antitrust plaintiff must allege more than threatened loss or damage that is merely "causally linked" to the defendant's anticompetitive behavior. *Id.* The plaintiff must additionally allege that its threatened injury "reflect[s] the anticompetitive effect either of the [antitrust] violation or of anticompetitive acts made possible by the violation." *Id.* Thus, even if a threatened injury is "causally related to an antitrust violation," it "will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

The antitrust injury requirement aligns antitrust suits brought by private parties "'with the purposes of the antitrust laws, and prevents abuses of those laws' by claimants seeking to halt the strategic behavior of rivals that increases, rather than reduces competition." *NicSand*, 507 F.3d at 449–50 (quoting *HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 847, 877 (6th Cir. 1991)). "It ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs . . . ." *Atl. Richfield Co.*, 495 U.S. at 342.

When the Supreme Court first articulated the requirement in *Brunswick*, for example, it held that plaintiffs seeking treble damages for alleged antitrust violations under § 4 of the Clayton Act, 15 U.S.C. § 15, had not established antitrust injury where they sought to recover for "profits they would have realized had competition been reduced" but for the defendant's pro-

competitive activities.  429 U.S. at 488.  The Court did not dispute that plaintiffs had suffered

injury-in-fact.  Emphasizing that the antitrust laws "were enacted for 'the protection of

competition not competitors,'" however, the Court held that it would be "inimical to the purposes

of [those] laws to award damages" for injuries a competitor suffered from increased competition.

*Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

      In *Cargill*, the Court applied the same principle in extending the antitrust injury

requirement to suits for injunctive relief under § 16.  *See* 479 U.S. at 109–13.  Monfort of

Colorado, then the country's fifth-largest beef packer, sued to enjoin the acquisition of Spencer

Beef, the number three beef packer, by Excel Corporation, the number two beef packer.  *Id.* at

106.  In its complaint, Monfort "alleged that the acquisition would 'violat[e] [§] 7 of the Clayton

Act because the effect of the proposed acquisition may be substantially to lessen competition or

tend to create a monopoly.'"  *Id.* at 107 (first alteration in the original).  Monfort further alleged

that the acquisition would "result in a concentration of economic power in the relevant markets"

that would allow the merged entity to bid up the cost of inputs and cause a drop in market prices,

such that Monfort was threatened with a profit loss.  *Id.* at 107 (internal quotation marks

omitted).

      Finding Monfort's complaint "of little assistance" in "determining what Monfort alleged

the source of its injury to be," *id.* at 113, the Court nonetheless was able to discern two distinct

theories of injury that Monfort alleged: first, conventional price competition, and second,

predatory pricing.[6]  The Court concluded that neither theory supported Monfort's claim to

antitrust injury.  *Id.* at 114–19.

---

[6] "Predatory pricing may be defined as pricing below an appropriate measure of cost for the
purpose of eliminating competitors in the short run and reducing competition in the long run."
*Cargill*, 479 U.S. at 117; *see id.* at 117–19 nn.12,13,15.

As to the first theory, the Court reasoned:

> *Brunswick* holds that the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws.  The kind of competition that Monfort alleges here, competition for increased market share, is not activity forbidden by the antitrust laws.  It is simply, as petitioners claim, vigorous competition.  To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share.  The antitrust laws require no such perverse result, for "[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition."

*Id.* at 116 (alteration in the original) (quoting *Arthur S. Langerderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1057 (6th Cir. 1984)).  As in *Brunswick*, where the Court did not question that plaintiff suffered lost profits, the *Cargill* Court accepted plaintiff's allegations of threatened injury-in-fact as sufficient.  Nonetheless, the Court concluded that "the threat of loss of profits due to possible price competition following a merger does not constitute a threat of antitrust injury."  *Id.* at 116–17.

The Court then turned to Monfort's second claim of antitrust injury: the threat that Excel would engage in predatory pricing.  *Id.* at 117.  The Court stated that predatory pricing "is a practice that harms both competitors *and* competition" and recognized that, in theory at least, losses threatened by predatory pricing constitute an injury of the type the antitrust laws were designed to prevent.  *Id.* at 117–18 ("Predatory pricing is thus a practice 'inimical to the purposes of [the antitrust] laws,' *Brunswick*, [429 U.S. at 488], and one capable of inflicting antitrust injury.") (first alteration in the original).  However, the Court concluded that Monfort had failed to properly press this claim before the district court, and that even if it had, it likely would not have succeeded given characteristics specific to the market it faced.  *Id.* at 118–19 & n.15.

The Supreme Court's analysis in *Cargill* is instructive as to both the principles underlying the concept of antitrust injury and the method of inquiry it demands.  Determining

whether a private party has standing to sue under § 16 of the Clayton Act requires a careful

assessment of the connection between the threatened loss or damage, on the one hand, and the

reason defendants' proposed conduct is allegedly illegal on the other.  As the Court clarified in

*Atlantic Richfield*:

> Conduct in violation of the antitrust laws may have three effects, often interwoven:  In
> some respects the conduct may reduce competition, in other respects it may increase
> competition, and in still other respects effects may be neutral as to competition. The
> antitrust injury requirement ensures that a plaintiff can [succeed] only if the loss stems
> from a competition-*reducing* aspect or effect of the defendant's behavior.

495 U.S. at 343–44.

Methodologically, then, assessing antitrust injury at the pleadings stage of a § 16 suit

requires two distinct inquiries.  First, does plaintiff's complaint allege a threatened injury-in-

fact?  Second, does the threatened injury result from an anticompetitive aspect of defendant's

proposed conduct, *i.e.*, that which would make the transaction illegal under the antitrust laws?  A

plaintiff has sufficiently pleaded a claim to antitrust injury only if its complaint satisfies both

inquiries[7] under the conventional Federal Rule of Civil Procedure 8(a) pleading standards that

govern "'in all civil actions.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, ---, 129 S.Ct. 1937, 1953 (2009)

(quoting Fed. R. Civ. P. 1); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–58, 570 (2007).[8]

---

[7] *Cf. Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806 (D.C. Cir. 2001) ("An antitrust
plaintiff must establish . . . a threatened injury-in-fact caused by the defendant's alleged
wrongdoing" and the injury "must be the kind of injury the antitrust laws were intended to
prevent; it must 'flow[] from that which makes defendants' acts unlawful.'" (quoting *Brunswick*,
429 U.S. at 489)).

[8] *See, e.g.*, *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010), *cert.
denied*, No. 10-1341, --- U.S. ---, ---, 2011 WL 4530161 (Oct. 3, 2011) (applying the Rule 8(a)
standard, as articulated in *Twombly* and *Iqbal*, to plaintiff's antitrust injury claims); *NicSand*, 507
F.3d at 451 (same); *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir.
2007) (same).

The Court's analysis, however, is not confined to the discrete question of whether Sprint and Cellular South have sufficiently alleged antitrust injuries.  Antitrust injury is but one factor to be considered in assessing whether private plaintiffs have standing to sue under the antitrust laws.  In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983), the Supreme Court described other factors relevant to determining whether a plaintiff seeking treble damages pursuant to § 4 of the Clayton Act has antitrust standing: "the directness of the injury, whether the claim for damages is 'speculative,' the existence of more direct victims, the potential for duplicative recovery and the complexity of apportioning damages."  *Andrx Pharm.*, 256 F.3d at 806 (citing *Associated Gen. Contractors*, 459 U.S. at 542–45); *accord Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005).

To be sure, "many of these other factors are not relevant to the standing inquiry under § 16," *Cargill*, 479 U.S. at 110 n.5, and therefore have no application here.  The antitrust standing inquiry under § 16 is "less demanding" than that under § 4 because § 16 "provides for injunctive relief, not treble damages," and therefore "the risk of duplicative recovery or the danger of complex apportionment that pervades the analysis of standing under [§] 4 is not relevant to the issue of standing under [§] 16."  *Palmyra Park Hosp.*, 604 F.3d at 1299–1300 (internal quotation marks omitted); *accord Adams v. Pan Am. World Airways, Inc.*, 828 F.2d 24, 26 (D.C. Cir. 1987).

Ultimately, "[t]he extent to which [factors other than antitrust injury] apply when plaintiffs sue for injunctive relief depends on the circumstances of the case," and "the weight to be given the various factors will [also] necessarily vary" depending on the context.  *Daniel*, 428 F.3d at 443.  Of particular relevance here is the fact that courts assessing the viability of a § 16

plaintiff's claim to antitrust injury on the pleadings have considered whether the plaintiff's

allegations are too speculative to be allowed to proceed.[9] Indeed, "Section 16's requirement of

'threatened injury,' 15 U.S.C. § 26, dovetails with Article III's requirement that in order to

obtain forward-looking relief, a plaintiff must face a threat of injury that is both 'real and

immediate, not conjectural or hypothetical.'" *In re New Motor Vehicles Canadian Exp. Antitrust

Litig.*, 522 F.3d 6, 14 (1st Cir. 2008) (some internal quotation marks omitted) (quoting *O'Shea v.

Littleton*, 414 U.S. 488, 494 (1974)).[10] Thus, although § 16 of the Clayton Act protects "against

*threatened* loss or damage by a violation of the antitrust laws," 15 U.S.C. § 26 (emphasis added),

and although § 7 "was intended to arrest the anticompetitive effects of market power in their

incipiency," *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967), the Act does not authorize

suits by those whose allegations of threatened injury amount to little more than conjecture.

With these principles in mind, the Court turns to Sprint's and Cellular South's claims to

antitrust standing and, in particular, antitrust injury.  For purposes of this inquiry only, the Court

assumes that AT&T's proposed acquisition of T-Mobile would violate § 7 of the Clayton Act,

---

[9] *See, e.g.*, *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 321–22 (3d Cir. 2007) (claims to
antitrust injury that are "too speculative" because they allege only "secondary injury" from the
proposed transaction are properly dismissed); *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d
256, 267–68 (3d Cir. 1998) (plaintiff's allegations of an antitrust injury amounted only to a
"speculative exercise," and plaintiff "cannot foist [its] version of what might have been on the
court under the rubric of antitrust injury"); *cf. Brooke Group Ltd. v. Brown & Williamson
Tobacco Corp.*, 509 U.S. 209, 230–31 (1993) (judgment as a matter of law is attained where
plaintiff's "theory of competitive injury through oligopolistic price coordination depend[ed]
upon a complex chain of cause and effect").

[10] *Cf. Associated Gen. Contractors*, 459 U.S. at 535 n.31 (In § 4 suits, "the focus of the doctrine
of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine.
Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of
injury in fact, but the court must make a further determination whether the plaintiff is a proper
party to bring a private antitrust action."); *Ross v. Bank of Am.*, 524 F.3d 217, 224–25 (2d Cir.
2008) ("Antitrust standing demands a much more detailed and focused inquiry into a plaintiff's
antitrust claims than constitutional standing.").

and focuses instead on whether plaintiffs have sufficiently alleged a threatened loss or damage

stemming from an aspect or effect of the proposed acquisition that would make it illegal.[11]

## II.    PLAINTIFFS' CLAIMS

Sprint and Cellular South allege threatened injuries that stem from both horizontal and

vertical aspects of AT&T's proposed acquisition of T-Mobile.  That is to say: as participants in a

number of different markets, wireless carriers are related both horizontally and vertically.  In

certain markets, the carriers compete with each other to sell outputs, and in other markets, they

compete to purchase inputs.  Such relationships are deemed horizontal in that they pit carriers

against carriers, acting in parallel as either sellers or buyers.[12]  (Where the carriers compete as

sellers, the proposed acquisition raises monopoly concerns.  Where they compete as buyers of

inputs, the anticompetitive form is monopsony.[13])  In yet other markets, the wireless carriers buy

---

[11] Because the antitrust injury inquiry is concerned not with *whether* the defendant's conduct
constitutes an antitrust violation, but rather questions *why* it would, courts assume a violation
*arguendo*.  *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d
912, 925 n.7 (3d Cir. 1999); *Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial
Inc.*, 919 F.2d 1517, 1520 n.2 (11th Cir. 1990); *Alberta Gas Chems. Ltd. v. E.I. du Pont de
Nemours & Co.*, 826 F.2d 1235, 1239 (3d Cir. 1987); *see also* IIA Phillip E. Areeda et al.,
*Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 335f , at 75 (3d ed.
2007) ("To test standing in a private suit, . . . assume the existence of a violation and then ask
whether the [antitrust standing] elements are shown.").

[12] *See Brown Shoe*, 370 U.S. at 334 ("An economic arrangement between companies performing
similar functions in the production or sale of comparable goods or services is characterized as
'horizontal.'").

[13] "Monopsony power is market power on the buy side of the market. . . . As such, a monopsony
is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially
called a 'buyer's monopoly.'"  *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*,
549 U.S. 312, 320 (2007) (citation omitted) (citing Roger D. Blair & Jeffrey L. Harrison,
*Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297 (1991)).  *See generally* Roger D. Blair
& Jeffrey L. Harrison, *Monopsony in Law and Economics* (2010).  In their pure form, monopoly
and monopsony refer to markets where there is but one seller or one buyer, respectively.  Unless
otherwise noted, the terms are used here to encompass markets where one firm, although
competing with others, possesses market power.

and sell services to and from each other, and are therefore vertically related.[14]  In this complex

and constantly evolving industry, markets are interconnected and the carriers play multiple roles

simultaneously.  The Court will address plaintiffs' claims regarding the horizontal effects of the

proposed acquisition before turning to their vertical claims, although it recognizes that this

distinction is not always clear-cut.

Assuming the truth of the facts that the plaintiffs allege, the Court describes each relevant

market and assesses the plaintiffs' claims of antitrust injury in it.  "To survive a motion to

dismiss, the pleadings must suggest a plausible scenario that shows that the pleader is entitled to

relief."  *Jones v. Horne*, 634 F.3d 588, 595 (D.C. Cir. 2011) (alterations and internal quotation

marks omitted).  Plaintiffs' complaints must therefore "contain sufficient factual matter, accepted

as true, to state a claim" to antitrust standing "that is plausible on its face."  *Iqbal*, 129 S.Ct. at

1949 (internal quotation marks omitted).  In particular, "[a] 'naked assertion' of antitrust injury,

the Supreme Court has made clear, is not enough; an antitrust claimant must put forth factual

'allegations plausibly suggesting (not merely consistent with)' antitrust injury."  *NicSand*, 507

F.3d at 451 (quoting *Twombly*, 550 U.S. at 557).

## A.  Horizontal Effects

AT&T, T-Mobile, Sprint, and Cellular South are primarily competing wireless carriers:

they compete horizontally to sell wireless services and a broad array of wireless devices,

including basic mobile phones, smartphones (*e.g.*, Android phones, BlackBerry phones, the

Apple iPhone), tablets (*e.g.*, the Samsung Galaxy Tab, the BlackBerry PlayBook, the Apple

---

[14] *See Brown Shoe*, 370 U.S. at 323 ("Economic arrangements between companies standing in a
supplier-customer relationship are characterized as 'vertical.'").

iPad), and other products that access their voice and data networks.[15]  In addition to competing

horizontally in the output market, the carriers compete horizontally in the input market, as

purchasers of wireless devices: they attempt to secure the most desirable devices for their

respective networks so they can sell them to customers.  The carriers also compete horizontally

as purchasers in the market for wireless spectrum, as they acquire new frequency bands and as

they work to develop and buy network equipment, chipsets, and device antennae that operate on

them.

### 1.  The Market for Wireless Services

Sprint and Cellular South compete with AT&T, T-Mobile, and other wireless carriers—

most prominently, Verizon—to sell wireless services.  In the market that is of primary concern

here, that for postpaid wireless services,[16] the "goods" in question consist of retail consumer

plans and corporate and government plans that customers purchase so that they can use their

wireless devices for voice calls, text messaging, and data delivery (*e.g.*, email and the internet).

The relevant market prices are the monthly fees that consumers pay for postpaid wireless

services and the bulk fee corporate and government entities negotiate for the same.  (*See* Sprint

Compl. ¶¶ 64–66, 72–74.)

Sprint and Cellular South allege that AT&T's acquisition of T-Mobile would affect an

illegal concentration of market power and lead to higher retail wireless rates.  Sprint opens its

complaint by declaring that, "[i]n one fell swoop," the proposed transaction "would eliminate

one of four national competitors" in the mobile wireless market "and marginalize a second

---

[15] The parties refer to these devices collectively as "handsets."

[16] "Typically, postpaid services require two-year contracts and are available only to customers
who satisfy a credit check.  Prepaid services, on the other hand, do not include two-year
contracts" and instead "allow the subscriber to pay up front for a month of service, or are pay-as-
you-go plans where a subscriber purchases . . . minutes in advance."  (Sprint Compl. ¶ 65.)

(Sprint), pushing the market back toward a 1980s-style cell phone duopoly that would force consumers to endure higher prices and be denied the fruits of vigorous innovation." (*Id.* ¶ 1; *see also id.* ¶ 2 ("On its face, the horizontal combination of AT&T and T-Mobile is a classic violation of antitrust merger law, resulting in market concentration far in excess of the thresholds established by" law.); Cellular South Compl. ¶¶ 10–14.)

Standing alone, however, such allegations do not help to resolve the question of whether these competitor plaintiffs have pleaded antitrust injury. At issue here are Sprint's and Cellular South's allegations regarding the injuries that *they* will suffer if the merger is consummated. Alleging harm to consumers, while relevant to showing an antitrust violation, is not sufficient to demonstrate antitrust injury; harm to *consumers* by way of increased prices is the type of injury the antitrust laws were designed to prevent, but it is not an injury-in-fact that *competitors* suffer.[17] When allegedly anticompetitive behavior "[has] the effect of either raising market price or limiting output" and is therefore "harmful to competition," it "actually *benefit[s]* competitors by making supracompetitive pricing more attractive." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986). Put plainly, "injury-in-fact . . . is absent when a plaintiff complains [only] that its competitors' merger [would be] illegal because it [would] increase[] market concentration unduly." IIA Areeda et al., *supra*, ¶ 335f, at 73; *see id.* ¶ 348b.

---

[17] That the Clayton Act enlists the assistance of competitors as "private attorney generals" to "'serve . . . the high purpose of enforcing the antitrust laws,'" *Cargill*, 479 U.S. at 129 & n.6 (Stevens, J., dissenting) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130–31 (1969)), does not obviate the requirement that competitors allege injury-in-fact, *id.* at 113 (citing *Brunswick*, 429 U.S. at 489). The conclusion that the Eleventh Circuit reached in a different context applies here with equal force: "[A private] plaintiff must do more than to bring a carefully timed lawsuit as a potential back-up to government action." *Royal Crown Cola Co. v. Coca-Cola Co.*, 887 F.2d 1480, 1493 (11th Cir. 1989) (denying attorney's fees to a competitor plaintiff where the plaintiff, because its § 16 suit stalled while the FTC pursued similar objections in a parallel court proceeding, had not demonstrated its own role in provoking the defendant to pro-competitive behavior).

That remains the case even if, as Sprint and Cellular South allege, the proposed acquisition will incentivize Verizon, "AT&T's most significant competitor post-merger, . . . to coordinate with AT&T rather than compete." (Sprint Compl. ¶ 3; *see id.* ¶¶ 195–98; Cellular South Compl. ¶¶ 73–76.)  In *Matsushita Electrical Industrial Co.*, the Supreme Court addressed allegations by American television manufacturers that their Japanese rivals "had illegally conspired to drive American firms from the . . . market."  475 U.S. at 577–78.  The Court began its analysis "by emphasizing what [plaintiffs'] claim is *not*:"

> Nor can [plaintiffs] recover damages for any conspiracy by [defendants] to charge higher than competitive prices in the American market.  Such conduct would indeed violate the [antitrust laws], but it could not injure [plaintiffs]: as [defendants'] competitors, [plaintiffs] stand to gain from any conspiracy to raise the market price in [televisions].

*Id.* at 582–83 (citations omitted).  The Court's logic is directly applicable here.  Whether the result of an increase in market concentration by itself, or "the oligopolistic price coordination" that "excessive concentration . . . portends," *Brooke Group Ltd.*, 509 U.S. at 229–30, an increase in market prices alone does not harm competitors.  To the contrary, "You *want* your competitors to charge high prices."  *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 778 (7th Cir. 1999) (Posner, J.).  The possibility that a post-merger AT&T could raise market prices does not, without more, threaten injury-in-fact to Sprint and Cellular South.  It therefore does not confer antitrust standing on them.[18]

---

[18] Sprint and Cellular South correctly note that defendants have not contested whether their complaints state a claim "that the acquisition violates [§] 7 by increasing AT&T's market power in the relevant wireless markets" and that it would "further enhance[] AT&T's power to raise prices post-merger." (Joint Opp'n at 16.)  But regardless of whether those "allegations state a plausible *prima facie* [§] 7 claim for harm to competition" (*id.* at 16–17), they do not state a plausible claim to antitrust injury because they do not allege that Sprint and Cellular South would suffer injury-in-fact.

### 2.  The Market for Wireless Devices

Plaintiffs claim that wireless devices "are becoming the primary driver in selection of wireless service." (Cellular South Compl. ¶ 54.)  "Device preference increasingly drives customer choice of wireless carriers." (*Id.*; *see* Sprint Compl. ¶ 79.)  As such, wireless carriers compete with each other to secure the most desirable devices for their own networks, sometimes leveraging exclusivity deals with device manufacturers to aid their efforts.[19]  Sprint and Cellular South allege that, together with Verizon, a post-merger AT&T would "foreclose their . . . access to the most innovative handsets and raise their costs," such that their "offers to [their] customers would be less attractive and [their] business would be injured." [20]  (*Id.* ¶ 159–60; *see id.* ¶¶ 4, 7, 79, 84–87, 157, 159–69, 208; Cellular South Compl. ¶¶ 12, 26, 50–63.)  The increased market concentration brought about by the proposed acquisition would, according to Sprint, "enable both AT&T and Verizon to coerce exclusionary handset deals . . . without AT&T having gained that advantage through competition on the merits." (Sprint Compl. ¶ 160.)

Where a defendant, by means of anticompetitive conduct, restricts or forecloses a competitor plaintiff's access to a necessary input, courts have found that the resulting loss is injury of the type that the antitrust laws were designed to prevent.  *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 478 (1992); *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97 CIV. 5499, 2000 WL 264295, at *22 (S.D.N.Y. March 9, 2000);

---

[19] Because the complaints do not allege that wireless carriers ever buy devices from each other, and instead describe the carriers as competing with each other to buy them from manufacturers, the alleged effects of the acquisition on the market for devices are horizontal even though the devices themselves are akin to inputs.

[20] The "most innovative handsets" are smartphones, "which integrate computer operating systems with phone capabilities and high resolution cameras." (Sprint Compl. ¶ 80; *see* Cellular South Compl. ¶ 52.)  In addition to being desirable to consumers, smartphones are attractive to carriers because with their purchase, subscribers typically sign-up for expensive data plans.

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F.Supp. 860, 878 (W.D.N.Y. 1994); *Tasty*

*Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250, 1276 (E.D.Pa. 1987).[21]  Indeed,

defendants concede that a plaintiff has stated a "theory of competitor harm" that is cognizable

under the antitrust laws" when it has alleged that its rival's anticompetitive acts will result in its

paying more for necessary inputs.  (Reply at 2.)[22]

        In *Eastman Kodak*, firms that serviced Kodak photocopiers (independent service

organizations or "ISOs") alleged that Kodak acted anticompetitively when it "adopted policies to

limit the availability of parts to [those firms] and to make it more difficult for [them] to compete

with Kodak in servicing Kodak equipment."  504 U.S. at 455.  Kodak machines required Kodak

parts, and Kodak parts were only available from Kodak directly or by way of original-equipment

manufacturers ("OEMs") that contracted with Kodak.  *Id.* at 456–57.  When Kodak limited direct

sales of parts to "buyers of Kodak equipment who use[d] Kodak service or [who] repair[ed] their

own machines," and additionally struck agreements with the OEMs preventing them from selling

parts to anyone but Kodak, the ISOs "were unable to obtain parts from reliable sources . . . and

many were forced out of business, while others lost substantial revenue."  *Id.* at 458.  The ISOs

sued, alleging "that Kodak had unlawfully tied the sale of service for Kodak machines to the sale

of parts, in violation of § 1 of the Sherman Act, and had unlawfully monopolized and attempted

---

[21] *See also* Edward A. Snyder & Thomas E. Kauper, *Misuses of the Antitrust Laws: The Competitor Plaintiff*, 90 Mich. L. Rev. 551, 561–63 (1991) (surveying literature exploring the "raising rivals' costs" theory of antitrust injury and describing why "the premise underlying" the theory "is straightforward"); *id.* at 585 ("Allegations of anticompetitive exclusion, if properly framed, will satisfy the antitrust injury requirement."); Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 Yale L.J. 209 (1986).

[22] (*See also* Motion to Dismiss Sprint at 6 ("competitors have established standing where they have plausibly alleged that they would be excluded from a market or suffer harm as a result of vertical effects of a merger—usually, foreclosure of supply of a needed input" (citing, *inter alia*, *Six West* and *Bon-Ton Stores*)).)

to monopolize the sale of service for Kodak machines, in violation of § 2 of that Act."  *Id.* at 459

(citing 15 U.S.C. §§ 1, 2).[23]

Neither the Supreme Court nor the lower courts questioned whether the ISOs had

established antitrust injury,[24] notwithstanding that they were Kodak's competitors in the market

for servicing Kodak photocopiers.  Indeed, the Supreme Court was unequivocal in declaring that

Kodak's "alleged conduct—higher service prices and market foreclosure—is facially

anticompetitive and exactly the harm that antitrust laws aim to prevent."  *Id.* at 478.  This was so

even though there existed some alternative sources of Kodak parts, *id.* at 458 & n.2, and even

though Kodak did not have market power in the interbrand market for its equipment.  *Id.* at 465.

What distinguishes the present case from *Eastman Kodak*, however, is the alleged source

of the defendants' power to impair plaintiffs' ability to compete in the input market.  In *Eastman

Kodak*, the defendant was both the plaintiffs' competitor and their supplier.  Here, the wireless

carriers—plaintiffs, defendants, Verizon, and all the rest, national and regional alike—compete

against each other as fellow purchasers of wireless devices, which they procure from

manufacturers in order to sell to consumers.[25]  It would not be the alleged antitrust violation—

---

[23] The ISOs sought both damages and injunctive relief.  *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1201 (9th Cir. 1997).

[24] *See Image Technical Servs., Inc. v. Eastman Kodak Co.*, No. C-87-1686-WWS, 1988 WL 156332 (N.D. Cal. April 18, 1988), *rev'd*, 903 F.2d 612 (9th Cir. 1990).  In fact, Kodak did "not dispute [the ISOs'] standing to bring [their §] 2 claim."  *Image Technical Servs., Inc.*, 903 F.2d at 619 n.6.

[25] The national carriers sometimes work directly with manufacturers to develop new devices for their networks.  (*See* Sprint Compl. ¶ 82.)  Regional carriers such as Cellular South have had far less success in this regard, allegedly because of their small subscriber base.  (*See* Cellular South Compl. ¶¶ 53, 58; *see also* Sprint Compl. ¶ 84 ("Because" device manufacturers "commonly require volume commitments from carriers," those "with small subscriber bases are at a significant disadvantage in attracting OEMs to develop new devices or technology for their networks.").)

AT&T's acquisition of T-Mobile—but rather the "anticompetitive acts made possible by the violation" that plaintiffs claim would injure them. *Brunswick Corp.*, 429 U.S. at 489. Theirs is a threatened "injury of the type the antitrust laws were intended to prevent," *id.*, but because their theory depends on the merged entity's monopsony power, and not its simple ability to refuse to sell to them, alleging a plausible threat of loss or damage is a more complex task for Sprint and Cellular South than it was for the *Eastman Kodak* plaintiffs.

Yet, other plaintiffs have succeeded on similar theories in the past. In *Six West*, an independent theater operator challenged the merger of its two major competitors, theater chains that were owned by vertically integrated movie distributors. 2000 WL 264295, at *1–2, 21. The plaintiff alleged that, because the transaction would "effectuate[] intimate affiliations between exhibitors . . . and distributors," it would "'impede plaintiff's ability to obtain quality motion pictures.'" *Id.* at *21 (quoting plaintiff's amended complaint). The Court concluded that plaintiff had alleged an antitrust injury because the merger would "effectively[] depriv[e] [p]laintiff of its ability to compete for first-run films." *Id.* at *22.

In *Bon-Ton Stores*, the Bon-Ton department store chain sought to enjoin the acquisition of McCurdy's, one of its local competitors, by May, one of its large national competitors. 881 F.Supp. at 862–63. With the acquisition, May would have acquired all of the available retail space for a department store in all of the main malls in Rochester, New York. *Id.* at 865. Bon-Ton argued that the merger would hinder its ability to enter the Rochester market because store space in malls was critical to the department store business. *Id.* at 876–77. The Court issued a preliminary injunction and denied defendants' motions to dismiss, concluding that Bon-Ton's threat of "effective exclusion from the Rochester market" constituted antitrust injury. *Id.* at 878

("Courts have held in many cases that a business which has been prevented from entering (and thus competing in) a market have standing to sue under the antitrust laws." (collecting cases)).

Finally, in *Tasty Baking*, the manufacturer of Tastykake snack cakes sued to unravel the merger of the manufacturers of the Hostess and Drake snack cake brands.  653 F. Supp. at 1254. The plaintiff alleged that the transaction would "impair [its] ability to enter new markets and develop business, by facilitating [defendants'] negotiations with retailers for better store shelf space and promotional time slots in markets where [plaintiff] does compete and by" enabling the merged entity to engage in predatory pricing.  *Id.* at 1255.  The Court concluded that the plaintiff had "alleged antitrust injury," and rejected defendants' argument that plaintiff's harm stemmed from defendants' "increased operating efficiencies" as stating "a factual dispute" but not "demonstrat[ing] any inadequacy" in the pleading.  *Id.*  Turning to the evidence adduced at the hearing on the preliminary injunction, the Court paid particular attention to the plaintiff's allegations of "threatened predatory non-pricing actions."  *Id.* at 1276.  The Court found support in the record for plaintiff's claims that defendants could "successfully pressure retailers" to stop carrying its products, to place them in less desirable locations in stores, and to allot them less promotional time.  *Id.* at 1273.  The Court concluded that because plaintiff's "entry into, expansion within, and preservation of share in relevant markets could be frustrated by defendants'" anticompetitive strategies, *id.*, plaintiff had standing to sue.  *Id.* at 1274.

Mobile wireless devices, and smartphones in particular, are Sprint's and Cellular South's first-run movies, mall locations suitable for department stores, and shelf space and promotional time, for they are necessary inputs for plaintiffs' businesses.  (Cellular South Compl. ¶ 54; Sprint Compl. ¶ 79.)  Like the plaintiffs in *Six West*, *Bon-Ton Stores*, and *Tasty Baking*, Sprint and Cellular South have alleged that the transaction in question threatens their continued access to

these inputs.[26]   As a general matter, plaintiffs' threatened injuries are those of the type the antitrust laws were designed to prevent, and courts have approved claims similar to those specifically raised here.

Nonetheless, the Court must still determine the sufficiency of plaintiffs' pleadings, and in particular the plausibility of their threat to injury-in-fact arising from the monopsony power AT&T would gain in the market for mobile wireless devices with the acquisition of T-Mobile. Defendants argue that, because plaintiffs' complaints do not describe the state of competition among device manufacturers, their claims must fail.  The Court disagrees.  Where monopsony power is the concern, what matters is market concentration on the buying side of the market, not the selling side.  *Weyerhaeuser Co.*, 549 U.S. at 320 ("Monopsony power is market power on the buy side of the market."); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (Sotomayor, J.) (Because "the equation for measuring market power in monopsony is a mirror

---

[26] Contrary to defendants' assertions (*see* Reply at 12 n.9), plaintiffs' allegations in *Six West*, *Bon-Ton Stores*, and *Tasty Baking* resemble those made here by Sprint and Cellular South: both go to reduced access or increased costs even while employing "foreclosure" language at times. *Compare Six West*, 2000 WL 265296, at *22 ("Plaintiff alleges that the merger causes antitrust injury by *restraining* [its] access to quality motion pictures" and "*limit[ing]* [its] ability to obtain select movies." (emphasis added)) *and Bon-Ton Stores*, 881 F. Supp. at 876–77 (Bon-Ton's chairman "testified that it is *more economical* to open a store in a mall as opposed to a stand-alone location or strip center," and the Court concluded that, while the merger would not make entry by a competitor "impossible," it was nonetheless "obvious that a significant and substantial barrier to entry would exist if May obtained all the present space in the four major regional shopping malls." (emphasis added)) *and Tasty Baking Co.*, 653 F. Supp. at 1255 (Plaintiff "claim[s] that defendants' monopolization illegally will *impair* [plaintiff's] ability to enter new markets and develop business . . . ." (emphasis added)) *with* (Sprint Compl. ¶ 160 ("With *reduced* access to the latest handsets post-acquisition, Sprint's offers to its customers would be less attractive and its business would be injured." (emphasis added)) *and id.* ¶ 163 (alleging that the proposed acquisition "would result in Sprint, as well as smaller carriers, facing . . . increased costs" and "substantial delays" for "the latest phones and consumer devices") *and* Cellular South Compl. ¶ 26 ("Regional carriers will not be able to obtain the latest wireless devices *in a timely fashion and at reasonable cost.*" (emphasis added)) and *id.* ¶ 58 ("The proposed merger would *reduce access* to the latest devices . . . . (emphasis added))).  Regardless, as an economic concept market foreclosure is measured in terms of costs: when costs are prohibitive, firms exit, or choose not to enter, markets.

image of the relationships that create market power in a seller[,] . . . [a] greater availability of substitute buyers indicates a smaller quantum of market power on the part of the buyers in question." (citation and internal quotation marks omitted)).[27]  That there may be and, indeed, by all accounts is, healthy competition among firms that *sell* mobile wireless devices is irrelevant to understanding whether, by acquiring T-Mobile, AT&T could so increase its *buying* power as to dictate terms to device manufacturers and otherwise impair plaintiffs' access to these necessary inputs.[28]  Judged against these standards, the Court concludes that plaintiffs' complaints contain sufficient facts, which must at this stage be accepted as true, to state a plausible claim to threatened loss or damage in the market for mobile wireless devices.

Sprint's and Cellular South's complaints provide factual support for the allegation that AT&T already possesses significant market power as a purchaser of mobile wireless devices, and that the acquisition of T-Mobile threatens them with harm.  Sprint alleges that the proposed transaction would add T-Mobile's 34 million customers to AT&T's 95 million customers, leaving the merged entity with 129 million customers (a 37 percent increase) (Sprint Compl. ¶¶ 94, 97) and controlling "in excess of 40 percent of the national markets."  (*Id.* ¶ 2; *see id.* ¶ 138; Cellular South Compl. ¶ 9 (alleging United States customer numbers for the national and regional carriers in the second quarter of 2011).).

---

[27] Indeed, the prototypical monopsonist is the factory in the company town.  Because the factory is the sole employer—the sole purchaser of labor—it can dictate wages, benefits, and working conditions regardless of how large the town's population.  *See, e.g.*, M. Todd Henderson, *The Nanny Corporation*, 76 U. Chi. L. Rev. 1517, 1553 (2009) ("Company towns were isolated geographically, attracted specialized labor, and were therefore often monopsony buyers of labor over large geographic and skill areas.").

[28] *See* Blair & Harrison, *Monopsony in Law and Economics*, *supra*, at 93 ("A monopsony issue in the area of horizontal mergers is raised when one buyer acquires a rival buyer and thereby increases the possibility that there will be an undesirable concentration of power on the buying side of the market." (emphasis deleted)).

Crucially, Sprint then alleges two links between a carrier's power as a seller in the output market and a carrier's power as a buyer in the input market. The first regards volume commitments:

> Given the expense of developing new handsets, [manufacturers] commonly require volume commitments from carriers in order to spread R&D and production costs over a large volume of unit sales. Because of these volume commitments, carriers with smaller subscriber bases are at a significant disadvantage in attracting [manufacturers] to develop new devices or technology for their networks. For example, while regional carriers now offer some smartphones, [manufacturers] developing handsets with the latest technology tend to design them for the large national carriers because they have the ability to sell the most phones, thus spreading R&D costs over a larger number of units.

(Sprint Compl. ¶ 84.)

Sprint's second alleged connection between concentration in the selling and buying markets relates to "exclusivity arrangements or 'time-to-market' advantages" through which larger carriers secure exclusive access to certain devices—typically "cutting-edge smartphones"—for a specific period of time. (*Id.* ¶ 85; *see* Cellular South Compl. ¶¶ 58–59.) Sprint alleges that the Federal Communications Commission ("FCC") has found that while larger carriers can negotiate handset exclusivity agreements, smaller carriers such as Sprint cannot. (Sprint Compl. ¶ 85.) Sprint cites Apple's iPhone as an example. AT&T was the exclusive provider of the "iconic" iPhone from 2007 until early 2011, when Apple "gave Verizon a time-to-market advantage . . . most likely because Verizon had the largest subscriber base in the United States." (*Id.* ¶ 86.) Accordingly, Sprint "had to compete without access to the iPhone for nearly five years." (*Id.*)[29] That AT&T and Verizon thus wielded their purchasing power in the past substantiates Sprint's claim to threatened injury-in-fact from the merger:

---

[29] The Court can take judicial notice of the fact that Sprint gained the ability to sell the iPhone with the release of the iPhone 4S on October 14, 2011, and that Cellular South will also reportedly sell the iPhone. *See* Darren Murph, *Sprint iPhone Officially Announced: iPhone 4 and 4S Both On the Way*, engadget.com, October 4, 2011, *available at*

> As a result of the proposed transaction's illegal increase in market concentration, the size and scale differential between AT&T and Verizon on the one hand, and Sprint and the fringe carriers on the other hand, would increase dramatically.  This would enable both AT&T and Verizon to coerce exclusionary handset deals . . . without AT&T having gained that advantage through competition on the merits.  With reduced access to the latest handsets post-acquisition, Sprint's offers to its customers would be less attractive and its business would be injured.

(*Id.* ¶ 160; *see id.* ¶ 162 (alleging that, in addition to endowing AT&T with the ability to secure more exclusive handset arrangements, the merger would allow AT&T to extract longer exclusivity periods).)[30]

Cellular South's claims to antitrust injury from the proposed transaction's effect on the market for wireless devices are, if anything, even more plausible.  Cellular South adds narrative to the numbers and market logic alleged by Sprint:

> Cellular South and other carriers have often been refused access to current devices and given access only when the device is no longer the most current model.  Cellular South and other carriers receive older phones at higher prices.  The proposed merger will continue and exacerbate that conduct.

(Cellular South Compl. ¶ 53; *see id.* ¶¶ 60, 63, 87.)

Cellular South also focuses on the proposed acquisition's elimination of "T-Mobile as an independent source of demand for wireless devices," thus squarely stating a monopsony concern.

---

http://www.engadget.com/2011/10/04/sprint-iphone-officially-announced-on-sale-october-14/; Roger Cheng, *Apple iPhone 4S: Soon at C Spire, But Not T-Mobile*, CNET.com, October 19, 2011, *available at* http://news.cnet.com/8301-1035_3-20122553-94/apple-iphone-4s-soon-at-c-spire-but-not-t-mobile/.  Nonetheless, Sprint's allegation that even it, the nation's third-largest wireless carrier, lacked access to the iPhone for almost five years adds plausibility to its alleged threat of harm from the proposed acquisition.

[30] The Court does not imply that handset exclusivity arrangements are themselves improper under the antitrust laws.  To the contrary, courts have concluded that restraints of this type are not anticompetitive.  *See, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997).  Rather, the Court merely credits Sprint's allegation that it will suffer harm from future exclusivity arrangements if AT&T acquires additional buying power in the market for devices.

(Cellular South Compl. ¶ 12; *see id.* ¶ 26 ("AT&T's acquisition of T-Mobile would further consolidate an already concentrated wireless industry and remove one independent customer (T-Mobile) with millions of device customers from the already short list of those wireless carriers ordering devices from device manufacturers.").)

But Cellular South worries about more than the mere fact of the post-merger AT&T's enhanced buying power in the market for devices.  It alleges that the proposed transaction would exacerbate its network interoperability woes.  As will be discussed in more detail below, not all carriers' networks are compatible with each other: phones designed for one network cannot be used on many others.  (*See* Section II(B)(1), *infra.*)  Cellular South claims that AT&T and Verizon have exercised their purchasing power in the markets for devices and network equipment to propagate "their own separate 'ecosystems' of compatible infrastructure . . . that cannot be utilized by other competitors," and that the proposed acquisition would increase the big carriers' "incentive and power to exclude competitors from those ecosystems."  (Cellular South Compl. ¶ 50.)  Accordingly, "Without T-Mobile's independent demand for devices, device manufacturers will be even less willing to design or build devices for any carrier, like Cellular South, which is operating outside of the ecosystem of one or the other of [Verizon and AT&T]."  (*Id.* ¶ 52.)  In other words, Cellular South alleges that the proposed acquisition threatens its access not only to handsets that are particularly desirable, but also, more fundamentally, to whole "ecosystems" of devices and network infrastructure—and customers.  Based on these allegations, the Court concludes that Cellular South's complaint also satisfies *Twombly* as regards its claim of threatened injury-in-fact from an anticompetitive aspect of the proposed merger—AT&T's acquisition of monopsony power in the market for mobile wireless devices.

By contrast, certain of the plaintiffs' seemingly device-related claims do not plausibly allege threatened injury-in-fact.  Sprint states that the post-merger AT&T would, with Verizon, compose a "Twin Bell duopoly" gatekeeper, controlling "access to the wireless bridge between upstream developers and the consumers they seek to connect with via wireless communications." (Sprint Compl. ¶ 9; *see id.* ¶¶ 187–88.)  This may be a plausible allegation, but it does not describe a threatened loss or damage to *Sprint*, as opposed to one faced by the upstream producers: merely claiming that "independent wireless carriers . . . would not have the features and content required to compete," (*id.* ¶ 188), does not suffice in the absence of facts about the market relationship between the carriers and those producers.

Sprint's claim to threatened injury arising from the potential loss of T-Mobile as a partner in ventures "to create substantial scale for the creation of new handsets and to compete with [AT&T and Verizon] for such handsets" also fails.  (*Id.* ¶ 161.)  Sprint frames this allegation in terms of "innovation in handsets," (*id.* ¶ 169; *see, e.g., id.* ¶¶ 4, 91; Joint Opp'n at 29), but in order to state a claim to antitrust injury it must do more—again, it must allege its own injury-in-fact stemming from defendants' allegedly anticompetitive behavior.  Along these lines, Sprint describes its past collaboration with T-Mobile in the Open Handset Alliance ("OHA"), where the two carriers worked with "mobile device and component manufacturers, software developers, semiconductor manufacturers," and others to "develop[] the Android mobile phone device platform."  (Sprint Compl. ¶¶ 88–90.)  Sprint argues that the proposed acquisition would "stifle collaborative efforts like the OHA in the future."  (Joint Opp'n at 29; *see* Sprint Compl. ¶ 169 ("Absent the proposed acquisition by AT&T, T-Mobile would continue to have the incentive and ability to partner with Sprint and other carriers.").)  And yet Sprint's chosen example, the OHA, included a number of firms engaged in various aspects of the wireless market.  (*Id.* ¶ 89.)  Even

accepting that the merger would eliminate T-Mobile as a potential participant in such ventures, there are no facts alleged that plausibly suggest their demise.

*Community Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146 (W.D. Ark. 1995), is of no help to Sprint here.  There, in determining that the plaintiff newspaper, the *Daily Record*, had antitrust standing to challenge the acquisition of one of its local competitors (the *Times*) by another of its local competitors (the *Morning News*), the Court found it significant that the challenged acquisition would spell the likely end "of a news and advertising sharing agreement" that was then in effect between the *Daily Record* and the *Times*.  *Cmty. Publishers, Inc.*, 892 F. Supp. at 1166.  Because of the dynamics of the local newspaper market and the fact that the agreement was only between the *Daily Record* and the *Times*, the Court assumed that the "anticompetitive incentive to terminate" the agreement would inevitably lead to the agreement's end.  *Id.* at 1167.  Here, by contrast, Sprint acknowledges that the OHA consists of many players, from many different industries.  (Sprint Compl. ¶ 89.)  Even if T-Mobile was a "critical, pioneering member[]" of the OHA, (*id.*), Sprint's complaint fails to allege facts in support of the claim that the proposed acquisition would cause the OHA to fall apart or leave Sprint without alternative partners in its quest to develop new wireless devices.

As discussed, however, the plaintiffs' complaints do state plausible claims that the proposed acquisition threatens them with loss and damage in the market for handsets generally.  Because their threatened injuries "flow[] from that which makes defendants' acts unlawful" in that they would result from the post-merger AT&T's increased monopsony power in a market for inputs that are necessary to their ability to compete, Sprint and Cellular South have adequately alleged a threatened antitrust injury with regard to the proposed acquisition's effects on their access to mobile wireless devices.  *Brunswick Corp.*, 429 U.S. at 489.

### 3.  The Market for Wireless Spectrum and Network Development

To assess Sprint's claims of potential injury in the market for wireless spectrum, it is first necessary to provide a brief explanation of contemporary mobile wireless technology and the government's role in regulating certain aspects of it.

Mobile wireless devices "convert voice, text, and data into radio signals, which are then transmitted to a cell site," consisting of an antenna or an array of antennas and "typically located on a tower or building."[31]  (Sprint Compl. ¶ 24.)  The FCC, "which is authorized under federal law to allocate the use of radio spectrum, established cellular telecommunications service" in 1981.  (*Id.* ¶ 25.)  The FCC "license[s] bands of spectrum in increments measured in hertz . . . to wireless providers."  (*Id.* ¶ 34.)  "The value of particular spectrum bands depends on many factors."  (*Id.*)

One factor affecting a band's value is the "propagation characteristics of the spectrum." (*Id.*)  For example, "Lower frequency signals travel greater distances and penetrate buildings and other obstructions more effectively."  (Cellular South Compl. ¶ 48; *see* Sprint Compl. ¶ 35.) "The FCC has licensed radio spectrum for commercial mobile wireless use primarily in bands between 700 MHz and 2500 MHz."  (*Id.* ¶ 35.)  Because the 700 MHz band (so-called "beachfront spectrum") is the "lowest frequency spectrum that the FCC has licensed for commercial mobile wireless communications," and therefore has "excellent propagation characteristics" such that "it can be built out with fewer cell sites and therefore less expensively

---

[31] For an explanation of how signals from the wireless networks connect to the traditional wireline network, see Section II(B)(2), *infra*.

than high frequency spectrum," (*id.* ¶ 37), licenses for it are highly desirable from the perspective of wireless carriers.  (Cellular South Compl. ¶ 48).[32]

Another factor affecting a spectrum band's value is "the extent to which an ecosystem of compatible infrastructure, equipment, and handsets exists for the bands" (Sprint Compl. ¶ 34) because, for example, the antenna on a mobile device and that at a cell site must be tuned to the same band in order for them to connect.[33]  (*Id.* ¶ 57.)  "Wireless carriers design and build their network infrastructure for specific spectrum bands."  (*Id.* ¶ 40.)  Bands that are "in use already have ecosystems of compatible infrastructure, equipment, and handsets," but developing a network on bands that have only recently been allocated by the FCC, such as the desirable beachfront spectrum on the 700 MHz band, requires "considerable investment."  (*Id.*)

To the extent that Cellular South's claims regarding wireless spectrum relate to cutting-edge wireless devices, these allegations have been addressed above.  (*See* Section II(A)(2), *supra*.)  Sprint, on the other hand, focuses on the fact that the merger "would add T-Mobile's spectrum to AT&T's already substantial spectrum holdings."  (*Id.* ¶ 170.)  Sprint also claims that, "[a]bsent the acquisition of T-Mobile, all of the national wireless carriers, with the possible exception of Verizon, likely would seek spectrum in 'new' bands for which the research and

---

[32] Sprint alleges that "AT&T and Verizon together control 92 percent of the paired 700 MHz spectrum suitable for commercial mobile broad band use in the top 54 most populous U.S. markets, and 100 percent of the paired 700 MHz spectrum suitable for commercial mobile broadband in the top 10 markets."  (Sprint Compl. ¶ 38.)  Cellular South alleges that, when the FCC "auctioned much of the 700 MHz spectrum" in early 2008, "AT&T and Verizon were able to purchase most" of it, "winning 85% (by value) of the paired spectrum."  (Cellular South Compl. ¶ 47.)  Sprint and Cellular South do not describe their own holdings of beachfront spectrum, nor do they allege how much T-Mobile has (and therefore how much of it AT&T would stand to gain if the proposed merger were to be consummated).

[33] Another requirement for connection is that a mobile device and a mobile network use the same transmission technology.  (*See* Sprint Compl. ¶ 57; Cellular South Compl. ¶ 38.)  Transmission technologies are addressed in the Court's discussion of the market for roaming.  (*See* Section II(B)(1), *infra*.)

development costs for new equipment have not yet been incurred." (*Id.* ¶ 171.) Thus, "[b]y acquiring developed spectrum through the T-Mobile acquisition, AT&T would effectively and improperly shift the costs of spectrum development to Sprint and other carriers" and "further weaken their ability to compete on the merits by increasing their costs and delaying their access to new equipment." (*Id.*)

What differentiates this claim from plaintiffs' devices claims is that here, Sprint has not alleged that the proposed transaction would be a merger-to-monopsony. Sprint does not claim that the acquisition would enable AT&T to muscle other carriers out of FCC auctions for wireless spectrum, but rather, that the transaction would add to AT&T's inventory of spectrum and reduce its network development costs. To the extent Sprint challenges the mere fact that, if AT&T acquires T-Mobile, it will also acquire some additional amount of spectrum, Sprint does not allege injury-in-fact. Without additional guidance as to this claim, the Court is left to assume that AT&T's acquisition of T-Mobile's spectrum would threaten Sprint with injury-in-fact only if the acquisition would curtail Sprint's access to a supply of spectrum that it demonstrably needed. The parties differ significantly as to the sufficiency of AT&T's spectrum holdings,[34] but Sprint neither alleges facts about T-Mobile's holdings nor describes its own holdings. Without more, Sprint has not alleged facts sufficient to state a claim to antitrust injury arising from AT&T's acquisition of T-Mobile's unknown stock of spectrum.

Sprint also claims antitrust injury on the theory that "[b]y acquiring developed spectrum through the T-Mobile acquisition, AT&T would effectively and improperly shift the costs of

---

[34] (*Compare* Sprint Compl. ¶ 36 ("AT&T holds a nationwide average of 40 MHz below 1 GHz—almost three times Sprint's holdings below 1 GHz, and slightly less than Verizon's average of 54 MHz below 1 GHz.") *with* Motion to Dismiss Sprint at 7 ("AT&T's acquisition of T-Mobile is driven by AT&T's need to alleviate a severe shortage of spectrum and network capacity constraints. . . . Sprint faces no spectrum constraints today, and it benefits so long as AT&T faces high costs and constraints on its ability to innovate.").)

spectrum development to Sprint and other carriers[,] . . . further weak[ening] their ability to compete on the merits by increasing their costs and delaying their access to new equipment." (*Id.*; *see id.* ¶ 174.)  In that it describes the carriers as collaborating successfully on market development,[35] this assertion stands in sharp contrast to a complaint that is otherwise thick with allegations of cut-throat rivalry and predatory behavior in the market for mobile wireless services.  Furthermore, even if the carriers' uncoordinated actions in developing new spectrum bands have yielded positive externalities in the past, what would be anticompetitive about the proposed acquisition if it eliminated those externalities and the carriers had to pay their own costs or, as it seems that Sprint is alleging, if the acquisition caused the costs to be split three ways rather than four?  This assertion lacks sufficient factual support.

For these reasons, defendants' Motion to Dismiss Sprint is granted as to Sprint's claims regarding spectrum and network development costs.

### B.  Vertical Effects

AT&T, T-Mobile, Sprint, and Cellular South also buy and sell services and products among themselves, such that Sprint and Cellular South challenge two vertical effects of the proposed acquisition—effects that alter the dynamics of their relationship with AT&T as purchasers of services that AT&T sells or that are allegedly related to services that AT&T sells.

Plaintiffs' first allegation of a vertical effect regards the market for roaming.  "Roaming agreements between carriers can be used to add coverage for subscribers beyond the carrier's

---

[35] (*See* Sprint Compl. ¶ 41 ("When multiple carriers build their networks and develop handsets at the same time in a newly allocated spectrum band, they all benefit from the shared costs of development.").)

network, or supplement its capacity." (Sprint Compl. ¶ 33.)[36] Regional carriers such as Cellular South are particularly dependent on roaming agreements: because they do not have nationwide networks, they rely on their contracts with the national carriers to provide their subscribers with coast-to-coast access to wireless networks. (Cellular South Compl. ¶ 27.) Both Sprint and Cellular South allege that the proposed acquisition threatens them harm because it will result in their paying higher prices for roaming. (*See* Sprint Compl. ¶ 183; Cellular South Compl. ¶ 27.)

Sprint alone raises a second claim regarding the proposed acquisition's vertical effects, this with regard to the market for "backhaul." Backhaul is also a necessary input in the market for mobile wireless services in that it connects cell sites to the traditional wireline networks where calls are routed. In addition to acting as wireless carriers themselves, AT&T and Verizon also supply the lion's share of backhaul to other wireless carriers, including Sprint and, at the present, T-Mobile. (Sprint Compl. ¶ 149.) Sprint alleges that by eliminating T-Mobile as an independent purchaser of backhaul, the proposed acquisition will enable AT&T and Verizon to charge Sprint and other carriers higher prices for the service. (*Id.* ¶¶ 7, 182.)

What plaintiffs' claims regarding roaming and backhaul share in common is the general allegation that AT&T's purchase of T-Mobile will result in plaintiffs paying more to procure necessary inputs. Accordingly, as it did with regard to plaintiffs' allegations about the proposed acquisition's effect on the market for wireless devices, the Court concludes that plaintiffs' alleged injuries are of the type that the antitrust laws were designed to prevent. *See* (Section II(A)(2), *supra*); *Eastman Kodak Co.*, 504 U.S. at 478; *Tasty Baking Co.*, 653 F. Supp. at 1273–

---

[36] For example, if a subscriber of Carrier A is in a location that is not served by Carrier A but that is served by Carrier B and Carrier C, the subscriber will still be able to use her phone if and only if Carrier A has a roaming agreement with Carrier B or Carrier C, or both. In this example, Carriers B and C are in a position to sell roaming to Carrier A.

76.  The inquiry focuses instead on the other component of antitrust injury: have plaintiffs

alleged, with the requisite specificity, a threatened injury-in-fact?

At the outset, it is important to note one critical difference between plaintiffs' devices

allegations addressed above, on the one hand, and their roaming and backhaul allegations on the

other.  In the market for devices, plaintiffs allege that AT&T's acquisition of T-Mobile would be

a merger-to-monopsony.  Their allegations of loss or damage stem from the post-merger

AT&T's purchasing power in the market for devices—an input market for all carriers.  Because

plaintiffs have alleged facts about the proposed transaction's effects on the output market (the

market for mobile wireless services), and because they posited links between AT&T's increased

selling power in the output market and its increased purchasing power in the input market, they

have stated a plausible claim to antitrust injury in the market for wireless devices.

In the markets for roaming and backhaul, however, plaintiffs do not raise monopsony

claims.  Rather, plaintiffs allege that they, along with T-Mobile, purchase roaming and backhaul

from AT&T and Verizon in various configurations.  Plaintiffs' roaming and backhaul claims

relate not to the merged entity's purchasing power, but rather to its selling power, for they allege

the proposed acquisition will increase concentration among sellers of roaming and backhaul (and

that they will be affected *as purchasers* in those markets).  The economic analysis does not differ

and the antitrust laws are concerned with both monopsony and monopoly power.[37]  But whereas

factual allegations about the output market (for mobile wireless services), combined with

descriptions of the links between the merged entity's power as a seller in the output market and

---

[37] *See Weyerhaeuser Co.*, 549 U.S. at 322 ("'[M]onopoly and monopsony are symmetrical
distortions of competition from an economic standpoint[.]' . . . The kinship between monopoly
and monopsony suggests that similar legal standards should apply to claims of monopolization
and to claims of monopolization." (first alteration in the original) (quoting *Vogel v. Am. Soc. of
Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984))).

its power as a buyer in the input market (for mobile wireless devices), sufficed to support plaintiffs' claims regarding devices, those allegations are less directly relevant to plaintiffs' claims regarding roaming and backhaul.  In order to successfully allege that the proposed transaction threatens them with injuries-in-fact in the markets for roaming and backhaul, plaintiffs must describe those markets with greater specificity than they have done if *Twombly* is to be satisfied.

### 1.  The Market for Roaming

Roaming allows one carrier's subscribers to access another carrier's network when they are outside of their own network's range, as long as the two carriers' networks are compatible and as long as the carriers have a roaming agreement.  (Sprint Compl. ¶¶ 55, 57; Cellular South Compl. ¶ 27.)

While a number of factors determine whether two networks are compatible, the parties emphasize transmission technology.[38]  (*See* Sprint Compl. ¶¶ 43–47; Cellular South Compl. ¶¶ 38, 40, 44.)  A transmission technology is, as the name implies, a particular means of transmitting information—perhaps akin to a language.  Two different transmission technologies predominate in the contemporary domestic market for mobile wireless services.  Of the national carriers, AT&T and T-Mobile use the "Global System for Mobile Communications" ("GSM"), and Verizon and Sprint use "Code Division Multiple Access" ("CDMA").  (Sprint Compl. ¶ 44; Cellular South Compl. ¶ 38.)  Ninety-seven percent of Cellular South's customers use CDMA, whereas three percent—the customers of Corr Wireless, which Cellular South recently acquired—use GSM.  (Cellular South Compl. ¶¶ 20–21, 67.)  Because they do not share a

---

[38] In addition to using the same transmission technology, a phone must be tuned to the same spectrum band as a competing carriers' network in order to function.  (*See* Sprint Compl. ¶ 57; Section II(A)(3), *supra*.)

language, an AT&T subscriber's phone is technologically incapable of connecting to the Verizon network but can connect to the T-Mobile and Corr Wireless networks, and a Sprint subscriber's phone cannot connect to AT&T's or T-Mobile's networks but can connect to Verizon's network, and so on.

Carriers have used various transmission technologies over time, but this basic divide between GSM and CDMA has persisted to the current, "third generation" networks ("3G").[39] (*Id.* ¶ 38; Sprint Compl. ¶ 45.)  Cellular South alleges that, with the move to "fourth generation" technology ("4G"), "all of the wireless industry is moving toward . . . 4G-LTE[,] . . . the 'gold standard' of wireless service."[40]  (Cellular South Compl. ¶ 40.)  For the present, however, device and network incompatibility is a powerful dynamic in the market for mobile wireless services. This is especially true for regional carriers, such as Cellular South, which depend on their ability to buy roaming from the national carriers in order to provide their customers with nationwide access.  (*Id.* ¶ 27, 65.)

Thus, carriers sign roaming agreements to supplement their networks' capacities and so their customers do not lose service when traveling outside their service areas.  (Sprint Compl. ¶¶ 33, 55.)  "Verizon and AT&T have large wireless network footprints in the United States," and "therefore have a higher percentage of on-network calls than other carriers" so "their subscribers have less need for roaming.  AT&T and Verizon realize revenue from carriers who contract for roaming services over their networks."  (*Id.* ¶ 56.)  Implicit in the fact that Verizon and AT&T have "*less* need" is the fact that they both buy and sell roaming, but Sprint's

---

[39] For example, "AT&T and T-Mobile use GSM-based High Speed Pack Access ('HSPA') technology" for their 3G mobile broadband service, and "Verizon and Sprint use[] CDMA-based Evolution Data Optimized ('EV-DO')."  (Sprint Compl. ¶ 45.)

[40] For its current 4G network, however, Sprint "uses WiMax technology."  (Sprint Compl. ¶ 46.)

complaint says nothing more about their purchasing activities.[41]  Nor does Sprint provide any description of its own roaming contracts.

Rather, Sprint merely alleges that "[t]he merger would raise [its] input costs for roaming." (*Id.* ¶ 183.)  Because Sprint is a CDMA carrier and AT&T and T-Mobile are GSM carriers, however, Sprint cannot purchase roaming from defendants.  In order to justify its allegation of threatened harm, Sprint posits the following sequence:  After the merger, AT&T will increase its retail wireless rates.

> Increasing its retail wireless rates would give AT&T an incentive to increase its roaming prices, and increasing its roaming prices to its rivals would support higher retail prices. With AT&T setting higher prices, Verizon would have an incentive to increase its retail prices and also to raise its roaming fees to CDMA carriers, including Sprint.

(Sprint Compl. ¶ 185.)  Even accepting for the moment that the acquisition will prompt AT&T to raise its retail rates, there remain three assumptions that underlie this scenario for which Sprint alleges *no* factual basis:  First, that AT&T's increased retail wireless rates would give it "an incentive to increase" the rates it charges its competitors for roaming; second, that Verizon would match AT&T's increase in retail rates rather than keep its prices low to attract new customers; and third, similar to the first, that Verizon's increased retail wireless rates would prompt it to raise its roaming fees to Sprint.

When counsel for Sprint was asked at oral argument to explain where the complaint alleged facts to support these assumptions, counsel did not cite facts and instead referenced a "basic economic principle" and an *Antitrust Law Journal* article upon which Sprint relied for its discussion of customer foreclosure. (10/24 Tr. 76 ("[T]his is a basic economic principle.  It's

---

[41] In court, counsel for AT&T represented that "even AT&T needs roaming.  In fact, we are [a] net buyer of roaming from Cellular South." (10/24/11 Tr. 50–51.)  The Court does not consider this representation for its factual value, but rather highlights it as an example of the kind of information that the complaints omit.

cited in the leading economics article, . . . Riordan and Salop. . . . We cited it."); *see* Joint Opp'n at 39–40 (discussing the market for backhaul, where Sprint is a customer of AT&T's (citing Michael H. Riordan & Steven C. Salop, *Evaluating Vertical Merger: A Post-Chicago Approach*, 63 Antitrust L.J. 513, 557 (1995) (addressing customer foreclosure))).)  But the referenced "principle" is nowhere to be found in the materials cited, since they relate to customer foreclosure and Sprint is not a customer of either AT&T or T-Mobile in the market for roaming. Without more, Sprint's allegation amounts to mere speculation, not a plausible scenario wherein Sprint would suffer injury-in-fact from the merger.  *See Twombly*, 550 U.S. at 570; *Broadcom Corp.*, 501 F.3d at 321–22.  Defendants' Motion to Dismiss Sprint is therefore granted as to Sprint's roaming claim.

Cellular South, on the other hand, presents more concrete claims to antitrust injury in the market for roaming when it alleges that, "[b]y reducing the number of potential roaming partners, the merger threatens" it with "pay[ing] higher roaming prices."  (Cellular South Compl. ¶ 27.)  The crucial difference is that Cellular South's Corr Wireless subsidiary, which uses the GSM transmission technology, has been a roaming customer of T-Mobile and is currently a roaming customer of AT&T.  (*Id.* ¶ 67.)  As such, given that roaming is a necessary input for Cellular South, the fact that "the removal of T-Mobile from the marketplace would leave only AT&T as a potential GSM roaming partner," (*id.* ¶ 68), might be enough to demonstrate Cellular South's antitrust standing.

Defendants protest that only "a small fraction of Cellular South's customer base relies on roaming technology compatible with AT&T's and T-Mobile's networks."  (Motion to Dismiss Cellular South at 8.)  This is certainly true, and defendants are correct that "Cellular South's assertion that AT&T and T-Mobile's merger will nevertheless somehow result in Cellular South

paying higher roaming rates for its CDMA technology to Verizon has no greater factual support than the parallel allegation in Sprint's complaint." (*Id.* at 9 (emphasis deleted).)  Cellular South has not alleged facts that would plausibly suggest that any cost increase by the post-merger AT&T for GSM roaming would hop the technological divide to CDMA roaming.  Accordingly, defendants' Motion to Dismiss Cellular South is granted as to Cellular South's CDMA roaming claims.

Defendants' Motion is denied, however, as to Cellular South's GSM roaming claims. Defendants have cited no case establishing a *de minimis* exception to antitrust injury.  Even if Corr Wireless represents only a small part of Cellular South's business, Cellular South's allegations suggest that its threatened loss from the merger is plausible.

First, Cellular South alleges that regional carriers' ability to procure roaming at reasonable rates is crucial to their business model:  "Reasonable and affordable roaming access has always been, and continues to be, a prerequisite for any wireless operator that does not own a nationwide network. . . . No wireless carrier can survive without access to a nationwide network for voice and data transmissions when the carrier's customers are outside the carrier's service area." (Cellular South Compl. ¶¶ 64–65.)  Second, Cellular South alleges that Corr Wireless had significant difficulties securing roaming agreements in the past.  (*Id.* ¶ 67 ("AT&T unreasonably and wrongfully refused a 3G roaming agreement with Corr Wireless until very recently, and even then, offered only unreasonable terms that amount to a constructive refusal to permit 3G roaming.").)  Third, Cellular South claims that Corr Wireless's experience was not unique, and that AT&T has a history of engaging in "exclusionary practices." (*Id.* ¶ 71.)  For example, "Cellular South alleges, on information and believe, that AT&T has engaged in a pattern and practice of denying roaming agreements to smaller carriers, as part of its efforts to monopolize

local markets and to injure competition." (*Id.*)  Looking to the future, Cellular South worries in particular about whether it will be able to negotiate 4G-LTE roaming agreements with the national carriers.  (*Id.* ¶¶ 66, 69–71.).  Taken together, these allegations of threatened price increases and possible foreclosure suffice to show Cellular South's antitrust standing to the extent that it relies on T-Mobile and AT&T for a critical input.

Defendants' appeal to the fact of FCC regulation of roaming does not, at this stage, defeat Cellular South's showing.  Defendants argue that FCC regulations require "all mobile wireless carriers to provide roaming for common carrier services to other carriers on a just, reasonable, and non-discriminatory basis."  (Motion to Dismiss Cellular South at 9.[42])  Yet in its complaint, Cellular South has alleged facts suggesting that AT&T presently does not negotiate roaming agreements in good faith (*see* Cellular South Compl. ¶ 71)—facts which the Court must accept as true for purposes of deciding defendants' motion, *Twombly*, 550 U.S. at 556, and facts which therefore must be heard to question the adequacy of the FCC's rules.[43]

---

[42] Defendants cite 47 C.F.R. § 20.12; Report and Order and Further Notice of Proposed Rulemaking, *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers*, 22 FCC Rcd 15817 (2007), *modified on recon.*, Order on Reconsideration and Second Further Notice of Proposed Rulemaking, *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, 25 FCC Rcd 4181 (2010); Second Report and Order, *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, 26 FCC Rcd 5411, 5423,  at ¶ 23 (2011), *appeals pending, Cellco P'ship v. FCC*, Nos. 11-1135 & 11-1136 (D.C. Cir. filed May 13, 2011).

[43] *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), is not to the contrary.  In *Trinko*, the Supreme Court noted that, "in certain circumstances, 'regulation significantly diminishes the likelihood of major antitrust harm.'"  540 U.S. at 412 (quoting *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 25 (1st Cir. 1990)).  But when considering a motion to dismiss, "likelihood" is not the issue: this Court is concerned with plausibility.  "Asking for plausible grounds to infer" a threatened injury-in-fact "does not impose a probability requirement at the pleading stage."  *Twombly*, 550 U.S. at 556.  Furthermore, *Trinko* did not address antitrust standing, *see* 540 U.S. at 416 n.5, and instead considered whether the plaintiff had stated an antitrust claim on the merits.  *See id.* at 417–18 (Stevens, J., dissenting) ("I would

### 2.  The Market for Backhaul

Backhaul comprises the physical infrastructure—dedicated copper, microwave, or fiber optic circuits—that connects cell sites to the wireline network to which wireless calls are routed.[44]  (Sprint Compl. ¶ 58.)  "Wireless carriers, including Sprint, depend on backhaul to connect their cell sites to their networks and to the public switched telephone network."  (*Id.* ¶ 125.)

Imagine a call placed from a cellphone to a landline phone.  Voice data travels wirelessly from the device to a cell site (on a given band of spectrum and via a particular transmission technology, as discussed).  The data then travels via backhaul from the cell site to the wireline network (where the call is routed[45]).  Once connected to the wireline network, the data finally makes its way to the recipient's phone, and the call is completed.

The contemporary market for backhaul reflects the recent history of the telecommunications industry.  "For decades" prior to its breakup in 1984, "the Bell System controlled wireline monopolies across the country."  (*Id.* ¶ 5.)  Since then, Sprint alleges that "the 'Ma Bell' descendants, AT&T and Verizon, have largely reassembled the Bell monopolies under their joint control."  (*Id.*)  Therefore, AT&T and Verizon own wires—both the wireline

---

not decide the merits of the [antitrust] claim unless and until such a claim is advanced by" a plaintiff with antitrust standing.).

[44] Backhaul is one form of "special access," and is regulated by the FCC's "special access rules." (Sprint Compl. ¶ 58; *see id.* ¶¶ 58–62 (criticizing the effectiveness of the FCC's regulatory regime).)  At least according to counsel for Sprint, the FCC uses the terms "backhaul" and "special access" interchangeably.  (10/24/11 Tr. 65.)  This Court will do the same: especially because the FCC's regulations do not factor into the Court's analysis, any distinction between backhaul and special access is not particularly relevant here.  However, the fact that Sprint makes distinct assertions about backhaul and special access, (*see, e.g.*, Sprint Compl. ¶¶ 149, 179–80), without defining the difference between them is illustrative of the complaint's vagueness with regard to this market.

[45] Calls between cellphones are also typically routed through the wireline network.

networks, which they control as "[t]he two remaining [incumbent local exchange carriers ("ILECs")] of the old Bell System," and the backhaul that connects cell sites to those networks. (*Id.* ¶ 59.)  Indeed, Sprint claims that AT&T and Verizon "are the predominant providers of [backhaul]," although, crucially, they compete with "some independent telecommunications firms" that also provide backhaul.  (*Id.*)  Specifically, Sprint alleges that "[o]ver 90 percent of all special access services in the United States, including backhaul, are provided by the ILECs, primarily AT&T and Verizon."  (*Id.* ¶ 149.)

Because it reflects the initial inheritances from the Bell System and the subsequent mergers among the Baby Bells, the market for backhaul is geographically bifurcated.  AT&T and Verizon have distinct traditional service territories, such that they rarely compete with each other as backhaul providers.  (*Id.* ¶¶ 134, 177; *see also* 10/24/11 Tr. 66 (Counsel for Sprint representing that "AT&T has [a historical legacy incumbent monopoly] in [its] half of the country.").)  AT&T's ILEC territory comprises twenty-two states.  (Sprint Compl. ¶ 181.)  Sprint alleges that "AT&T has market or monopoly power for backhaul in a number of relevant geographic markets . . . in its traditional service territor[y]."  (*Id.* ¶ 151.)

Like Sprint's claims to antitrust injury in the markets for mobile wireless devices and roaming, Sprint's claim to antitrust injury in the market for backhaul alleges that the proposed acquisition would increase Sprint's costs for a necessary input.  (*Id.* ¶ 175.)  Sprint purchases backhaul from AT&T.  (*Id.* ¶ 176 ("Sprint pays about $1 billion per year for . . . backhaul, mostly to AT&T and Verizon.").)  Where these claims differ, however, is with regard to T-Mobile's current role in the market.  T-Mobile, while not a potential roaming partner for Sprint due to the incompatibility of their networks, both buys and sells roaming.  With regard to backhaul, by contrast, T-Mobile is only a fellow purchaser.

Sprint cannot allege, therefore, that the proposed transaction would be a merger-to-monopoly.  By acquiring T-Mobile, AT&T will not gain any backhaul infrastructure, and the merger would not lead immediately to increased concentration among backhaul *suppliers*.  Sprint gets there in a roundabout way, though, by alleging first that the acquisition will decrease the number of backhaul *purchasers*.  Sprint quotes an industry association filing before the FCC stating that "'AT&T has indicated that it will move T-Mobile's backhaul traffic on to its own transport network wherever possible.'"  (*Id.* ¶ 181.)  The same filing states that T-Mobile currently sources backhaul "'for approximately 20 percent of its cell sites'" from independent providers, *i.e.*, not AT&T and not Verizon.  (*Id.* ¶ 181; *see id.* ¶ 178–79 (describing T-Mobile "as a purchaser of backhaul with a strong interest in obtaining services from alternative backhaul providers" and as a source of "business opportunities for competitive providers").)  When the merger eliminates that demand, Sprint's theory goes, independent providers will exit the market and the incentives for entry by new providers will be diminished.  (*Id.* ¶¶ 152, 178–79.)  At the end of this chain of events, the market for backhaul is more concentrated and Sprint will suffer harm when AT&T and Verizon, no longer checked by rival suppliers, are able to raise their rates. (*Id.* ¶ 175.)

It bears repeating that, as has been established and as defendants concede (*see* Reply at 2), such an injury would be of the type that the antitrust laws are designed to prevent.[46]  (*See* Section II(A)(2), *supra*.)  Having satisfied the second component of antitrust injury, if Sprint

---

[46] The parties' disputes as to the application of cases finding antitrust standing when a competitor raises its rivals' costs by means of an anticompetitive act are therefore beside the point.  (*See* Joint Opp'n at 39–44 (citing, *inter alia, Ford Motor Co. v. United States*, 405 U.S. 562 (1972); *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568  (7th Cir. 1999); *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone Inc.*, 140 F.3d 1228 (9th Cir. 1998)); Reply at 16–17 (disputing plaintiffs' characterization of *Ford Motor Co.*).)

stated a claim to threatened injury-in-fact in the backhaul market that was plausible on its face, Sprint would succeed.

As it stands, Sprint's claims fail.  Sprint alleges no facts to support its theory that the elimination of T-Mobile as a purchaser of backhaul will increase concentration among backhaul sellers by putting the independent providers out of business.  Sprint might have described the independent providers (by more than just name (*see* Sprint Compl. ¶ 149)) and the local markets where T-Mobile's presence as an independent purchaser ensures their survival.  Crucially, Sprint might have provided even rough estimates of the percentage of the independent purchasers' business that T-Mobile represents.[47]  Sprint's complaint, however, says nothing about the sell side of the market apart from its statements regarding AT&T's and Verizon's present market power and its claims about barriers to entry and expansion.  (*See id.* ¶¶ 149–51, 177–79.)  The Court therefore has no means by which to assess the plausibility of the scenario Sprint suggests. That the scenario is extreme—positing that the decrease in demand after T-Mobile's elimination as a purchaser will be so significant as to be lethal to the independent providers, leading to a price *increase*, whereas demand decreases usually coincide with price *decreases*—only makes the Court's task more difficult.  At the pleadings stage, Sprint need not supply "detailed factual allegations," and yet it must state facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Because its complaint leaves so much to conjecture, Sprint fails to adequately allege a threatened injury-in-fact in the backhaul market.  Defendants' Motion to Dismiss Sprint is granted as to Sprint's backhaul claim.

---

[47] That T-Mobile relies on independent providers for 20 percent of its backhaul needs, (Sprint Compl. ¶ 181), is irrelevant to how much the independent providers rely on T-Mobile as a customer.

## CONCLUSION

Time and again, the Supreme Court has emphasized that "'a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Id.* at 558 (quoting *Associated Gen. Contractors*, 459 U.S. at 528 n.17). It is no accident that antitrust cases provoke these recitations.

While perhaps "elusive,"[48] the antitrust injury requirement not only aligns private antitrust enforcement to the aims of the antitrust laws; it also performs the more conventional function of only allowing plaintiffs to proceed on claims made facially plausible by the allegation of sufficient facts. *Id.* at 570; *see NicSand*, 507 F.3d at 451. It is unsurprising, therefore, that established precedent forecloses competitors' claims that challenge a proposed transaction's effect on competition without sufficiently alleging the threat of an injury-in-fact that they face and that is "'of the type the antitrust laws were designed to prevent.'" *Cargill*, 479 U.S. at 113 (quoting *Brunswick Corp.*, 429 U.S. at 489). Such claims belong to the government. But where private plaintiffs have successfully pleaded antitrust injury, the fact that they are defendants' competitors is no bar. *Cf. id.* at 120–22 (rejecting the government's proposed per se rule denying competitors standing to challenge acquisitions on the basis of predatory pricing theories).[49]

---

[48] *Blue Shield of Va. v. McCready*, 457 U.S. 465, 477, 478 (1982); *see* Ronald W. Davis, *Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury*, 70 Antitrust L.J. 697 (2003).

[49] "'[T]he scheme of the [Clayton Act] is sharply to distinguish between Government suits, either criminal or civil, and private suits for injunctive relief or for treble damages. Different policy considerations govern each of these. They may proceed simultaneously or in disregard of each other.'" *United States v. Borden Co.*, 347 U.S. 514, 518–19 (1954) (first alteration in the original) (quoting *United States v. Bendix Home Appliances*, 10 F.R.D. 73, 77 (S.D.N.Y. 1949) (Rifkind, J.)).

Defendants' Motion to Dismiss Sprint and Motion to Dismiss Cellular South are both denied insofar as they challenge plaintiffs' claims to antitrust injury with regard to the proposed acquisition's effects on the market for mobile wireless devices.  (*See* Section II(A)(2), *supra*.) Defendants' Motion to Dismiss Cellular South is denied insofar as it attacks Cellular South's antitrust standing to pursue claims regarding the role of Corr Wireless as a purchaser of GSM roaming.  (*See* Section II(B)(1), *supra*.)  Defendants' motions are granted as to plaintiffs' remaining claims.

_____/s/_____<br>ELLEN SEGAL HUVELLE<br>United States District Judge

Date:   November 2, 2011